## UNITED STATES of America ex rel. James P. FREE, Jr., Petitioner,

v.

## Kenneth McGINNIS, Warden of Pontiac Correctional Facility, Howard Peters III, Director of Illinois Department of Corrections and Roland W. Burris, Illinois Attorney General, Respondents.

### No. 89 C 3765.

United States District Court, N.D. Illinois, E.D.

July 7, 1992.

**1100**

Kimbal Richard Anderson, Winston & Strawn, Chicago, IL, for petitioner.

Arleen C. Anderson, Vincenzo Chimera, Paula J. Giroux, Illinois Attorney General's Office, Chicago, IL, Jack Donatelli, United States Attorney's Office, Chicago, IL, for respondents.

*Magistrate Judge's Report and Recommendation Regarding Juror Comprehension Studies of Professor Hans Zeisel and Their Application To Grounds for Relief 5, 10 and 14 Of Petition for Habeas Corpus*

WEISBERG, United States Magistrate Judge.

Petitioner James Free was convicted on June 22, 1979 in the Circuit Court of Du Page County for the April 24, 1978 murder and attempted rape of Bonnie Serpico and the attempted murder and attempted rape of Lori Rowe. The facts of the crime do not concern us here. The prosecutor requested a hearing to determine whether the death penalty should be imposed, and a two-stage hearing was held in accordance with Illinois law. The jury unanimously found beyond a reasonable doubt that the victim was murdered in the course of a burglary and rape, aggravating factors permitting the imposition of the death penalty. After hearing evidence in aggravation and mitigation, the jury found no mitigating factors that precluded the imposition of the death penalty and on August 7, 1979 Free was sentenced to death.

On January 24, 1983, the Illinois Supreme Court affirmed Free's conviction and sentence. *People v. Free*, 94 Ill.2d 378, 447 N.E.2d 218, 69 Ill.Dec. 1 (1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Free filed two separate petitions for post-conviction relief in the Illinois state courts. Each petition was dismissed and the Illinois Supreme Court affirmed each dismissal. *People v. Free*, 112 Ill.2d 154, 492 N.E.2d 1269, 97 Ill.Dec. 396 (1986), cert. denied, 479 U.S. 871, 107 S.Ct. 246, 93 L.Ed.2d 170 (1986); *People v. Free*, 122 Ill.2d 367, 522 N.E.2d 1184, 119 Ill.Dec. 325 (1988), cert. denied, 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). Having exhausted all available state remedies, Free filed this habeas petition raising 21 separate grounds for relief. The state has stayed Free's execution pending the final disposition of this petition.

In an opinion dated November 5, 1991, *Free v. Peters*, 778 F.Supp. 431, Judge Aspen dismissed all but three grounds for relief. These remaining claims, Grounds 5, 10 and 14, attack the Illinois Death Penalty Act and

jury instructions. Free contends that those instructions provide constitutionally inadequate guidance to capital sentencing jurors, specifically, that they confuse the jury on five important issues: (1) whether jurors must unanimously agree on the existence of mitigating factors, (2) whether jurors may consider mitigating factors not mentioned by the court as reasons not to impose death, (3) which party bears the burden of persuasion, (4) whether the existence of a mitigating factor mandates a non-death verdict and (5) whether the jury must unanimously agree as to its ultimate verdict of life or death.

Judge Aspen noted that the constitutionality of the Illinois statute and jury instructions had been upheld in *Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990), cert. den. 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), and *Williams v. Chrans,* 742 F.Supp. 472 (N.D.Ill.1990) (Aspen, J.), aff'd, 945 F.2d 926 (7th Cir.1991), cert. denied, — U.S. —, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). In *Silagy,* the Seventh Circuit rejected arguments that the Illinois death penalty statute and jury instructions unconstitutionally impose a presumption in favor of death (Free's Ground 5) and shift the burden of proof to the defendant to overcome that presumption (Free's Ground 6). *Silagy,* 905 F.2d at 997–1000. *Williams* rejected the related argument that the failure of the Illinois sentencing scheme to assign a specific standard of proof as to the ultimate issue renders the scheme unconstitutional (Free's Ground 14). *Williams,* 742 F.Supp. at 499–500. *Williams* additionally rejected the argument that the statute is unconstitutionally vague and fails to narrowly channel the sentencing authority's discretion, creating the impermissible risk that the death sentence will be imposed arbitrarily and capriciously (Free's Ground 10). *Id.* at 500.

Nevertheless, Judge Aspen reserved ruling on these claims because Free had offered the results of a juror study conducted in April 1990 by Professor Hans Zeisel which, according to Free, shows that jurors are not properly guided by the semantics of the statute. Judge Aspen believed that the study results,

> [i]f statistically reliable and unbiased ... call into question the empirical assumptions as to juror comprehension which

served as the predicate to the rulings in [*Silagy* and *Williams*].

Thus, the question we face is whether it is appropriate to consider such evidence as a means of supplanting those prior rulings. Although Free cites no case law on the question, he makes the compelling argument that a finding, which turns on how jurors comprehend the law they are told to apply, should be based if possible on substantial evidence rather than judicial speculation.

*Free,* 778 F.Supp. at 434–35.

Judge Aspen directed this court to hold an evidentiary hearing to consider the validity of the Zeisel study and its applicability to these three grounds for relief. A hearing was held on January 13, 14 and 15, and February 4, 5 and 7, 1992. The court heard the testimony of experts in empirical jury studies, statistics, survey methodology and linguistics. During the recess Zeisel carried out a second jury survey which was admitted in evidence. The parties filed post-trial briefs and proposed findings of fact and conclusions of law.

This Report will address the issues before us in the following manner. In Part 1 we will review Illinois' procedure for imposing the death penalty. Part 2 summarizes Free's claims which have been referred here and the constitutional requirements invoked in this case. Part 3 describes the Zeisel studies (sometimes called the Illinois Capital Jury Surveys). Part 4 assesses the challenges to their validity and reliability. In Part 5 we discuss whether several of Free's claims have been procedurally defaulted on the ground urged by respondents that the Zeisel studies were available to Free during the period of his state court post-conviction proceedings. Finally, Part 6 analyzes the impact of the empirical evidence on the pertinent claims in Free's petition.

### 1. The Illinois Death Penalty Act

Under the Illinois Death Penalty Act, the prosecution may request a capital sentencing hearing after the defendant pleads guilty to or is convicted of murder. Ill.Rev.Stat. (1979) ch. 38 ¶ 9–1(d). In the first phase of the hearing the state must prove beyond a reasonable doubt that the defendant is eligi-

ble for the death penalty: that the defendant was at least eighteen years old at the time of the offense and that one or more of seven statutory aggravating factors exist.[1] If the jury unanimously finds that the defendant is eligible for the death penalty, the second phase commences. The state presents evidence of any aggravating factors, statutory or otherwise, and the defense presents mitigating circumstances. The statute lists five potentially relevant mitigating factors, but only by way of example.[2] The defendant may present any aspects of the defendant's character or record, and any of the circumstances of the offense that militate against the imposition of the death sentence. The criminal rules of evidence are relaxed in this phase. The following statutory language provides the standard by which the jury is to assess the mitigating and aggravating factors:

> If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.
>
> Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.

Ill.Rev.Stat. (1979) ch. 38, ¶ 9–1(g). The death sentence is imposed only if all jurors agree that the mitigating factors are insufficient to preclude a death sentence. If the jurors unanimously agree that no such mitigating factors exist, then the court must impose a death sentence. However, a juror may find a mitigating factor even if the defendant presents no evidence at the sentencing hearing.[3]

The Illinois Supreme Court has held that the statute requires the jury to weigh aggravating and mitigating factors. *People v. Brownell*, 79 Ill.2d 508, 38 Ill.Dec. 757, 770, 772, 404 N.E.2d 181, 194, 196 (1980). That court has also said that the defendant has the burden of persuasion on the question of whether sufficient mitigating circumstances exist to preclude the imposition of the death penalty. *People v. Bean*, 137 Ill.2d 65, 147 Ill.Dec. 891, 894, 560 N.E.2d 258, 291 (1990). On the other hand, in the same opinion, the court said, "we note that the defendant does not *alone* have a burden of persuasion at this balancing stage, for the State is the movant, the party seeking the death penalty, and so *bears the primary burden* of persuading the jury that, as the statute states, there are no mitigating factors sufficient to preclude the sentencer from imposing the sentence of death for which the defendant is eligible." *Id.*, 147 Ill.Dec. at 925, 560 N.E.2d at 292 (emphasis added). The court then added:

---

1. The relevant aggravating factor in this case was the following:

   (b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:

   \*   \*   \*   \*   \*   \*

   6. the murdered individual was killed in the course of another felony if: (a) the murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime; and (b) the defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and (c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child. . . .

   Ill.Rev.Stat. (1979) Ch. 38 ¶ 9–1(b).

2. Mitigating factors may include but need not be limited to the following:

   1. the defendant has no significant history of prior criminal activity;
   2. the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution;
   3. the murdered individual was a participant in the defendant's homicidal conduct or consented to the homicidal act;
   4. the defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm;
   5. the defendant was not personally present during the commission of the act or acts causing death.

   Ill.Rev.Stat. (1979) ch. 38 ¶ 9–1(c). Of these, only (1) and (2) were relevant and included in the *Free* jury instructions.

3. This description, slightly modified, is taken from *Williams v. Chrans*, 945 F.2d 926, 934–35 (7th Cir.1991).

We note also that because this is a process of balancing intangibles, not of proving facts, it is improper to speak of defendants as having a "burden." After the State as movant has attempted to persuade the jury the death sentence should be imposed, a defendant may attempt to dissuade the jury from doing so. Whether defendant attempts to dissuade the jury, whether he decides to take up this "burden," is up to him; the law does not require him to take it up.

*Id.*

In *Silagy*, the Seventh Circuit agreed with the Illinois Supreme Court's reading and held that this aspect of the statute satisfies the Eighth and Fourteenth amendments. *Silagy*, 905 F.2d at 998–1000.

### 2. *Free's Claims*

Free's Ground Five, Petition ¶¶ 62–65, claims that the Illinois Death Penalty Act and jury instructions create a presumption in favor of death. He maintains that although *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), and *Silagy* held that such a presumption is not unconstitutional, the instructions are defective because they leave the jury without guidance as to which side has the burden of proof and what standards to apply in considering the aggravating and mitigating evidence. Petitioner's Pretrial Br. at 12–15.

The Tenth Ground for relief, Petition ¶¶ 89–93, claims that the statute and the instructions in this case are unconstitutionally vague and fail to provide clear and objective standards to guide the jury in its sentencing determination. Petitioner's Reply filed September 7, 1990 at 33–34 contends that the key instruction is vague and incomprehensible and did not provide the jury with sufficient guidance concerning 1) whether they must unanimously find the existence of a mitigating factor before any one juror can consider it; 2) whether a mitigating factor must be substantially the same or similar to ones listed by the judge; 3) whether one mitigating factor must singly outweigh all aggravating factors in order to preclude the imposition of the death penalty; and 4) whether the defendant's failure to prove that mitigating factors exist mandates imposition of the death penalty.

Free's Fourteenth Ground claims that the statutory scheme is unconstitutional because it is devoid of any sentencing guidance concerning the burden of proof as to the ultimate issue of life or death. Petition ¶¶ 106–10.

Respondents contend that, with two exceptions, Free's claims are procedurally defaulted because they were not fairly presented to the Illinois courts. That contention was rejected by Judge Aspen, *Free*, 778 F.Supp. at 435 n. 3, and it is inappropriate to reconsider that ruling here. However, respondents also attack Judge Aspen's alternative ruling that even if Free's claims in Grounds Ten and Fourteen are procedurally defaulted, that bar must be avoided because Free has shown cause, i.e., that the Zeisel survey evidence was unavailable to Free at the time of his prior state court petitions. Since respondents' attack is based on evidence developed at the hearing, we defer discussion of that issue until after our description of the Zeisel survey evidence.

### Constitutional Requirements

We summarize briefly the constitutional requirements invoked by Free. Imposition of the death penalty may not be capricious or arbitrary and to that end the discretion of the sentencer must be channeled and controlled. At the same time the unique nature of the death penalty requires that the sentencer be able to consider anything that might plead in favor of clemency. Thus, the sentencer's discretion must be channeled by clear and specific and detailed guidance which make the process for imposing a sentence of death rationally reviewable, *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980). The sentencer must be free to consider any potentially mitigating circumstance and therefore cannot be limited to mitigating factors enumerated in a statute or judicial instructions. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). A sentencing jury must be free to consider any mitigating circumstance; thus, requiring the jury to agree unanimously on the existence of a mitigating factor before it may be considered by any juror violates the Eighth Amendment. *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860,

100 L.Ed.2d 384 (1988); *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

### 3. *The Illinois Capital Jury Surveys*

In 1990 and 1992 Hans Zeisel, a pioneer and leading expert in empirical studies of jury behavior, carried out surveys of comprehension of jury instructions based on the Illinois capital sentencing statute. The surveys were given to a total of 238 persons who had been summoned for jury duty at the Daley Center in Chicago. With the approval of the Chief Judge of the Circuit Court of Cook County, jury officials assigned panels of prospective jurors already assembled for courtroom jury service to courtrooms in which the surveys were conducted.

The surveys (1) identified and excluded survey respondents who would always vote for the death penalty or would be subject to challenge under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), because of personal opposition to the death penalty, (2) summarized the facts in the *Free* case with the names changed, (3) set out in the 1990 survey the 1987 Illinois Pattern Instructions (IPI) for the second phase of capital sentencing proceedings and in the 1992 survey the actual instructions given to the jury in the *Free* case, (4) asked sixteen questions designed to test the survey respondents' comprehension of those instructions by asking whether hypothetical jurors making certain judgments had followed the instructions and (5) asked whether the survey respondents would lean for or against the death penalty in the case described to them.

The surveys were designed to test juror comprehension of five issues.

1. Whether a jury must unanimously agree on the existence of a mitigating factor before that factor can be considered by an individual juror (questions 4 and 5).

2. Whether the jury is free to consider mitigating factors not enumerated in the judge's instructions (questions 1, 2, 6, 7, 8, 9, 10 and 11).

3. Whether the existence of a mitigating factor bars a sentence of death (question 3).

4. Who has the burden of proof on the appropriate sentence (questions 12, 13, 14 and 15).

5. Whether a jury which is divided on the penalty issue should return a verdict or tell the judge they cannot reach a unanimous verdict (question 16).

The survey questions are attached as Appendix A to this Report.

Free contends that the survey results show high levels of misunderstanding of the IPI Instructions and the substantially similar instructions given to the jury in his case and that those instructions therefore did not provide constitutionally adequate guidance to channel the jury's discretion. He points to the following results:

1. Between 15% and 36% (in this Report all fractions above .5 are rounded to the next highest integer) of the respondents answered questions 4 and 5 incorrectly, indicating their belief that all members of the jury must agree on the existence of a mitigating factor before any juror may consider that factor, contrary to *Mills v. Maryland and McKoy v. North Carolina.*

2. Between 39% and 68% of the respondents answered questions 2, 7, 8, 9, 10 and 11 incorrectly, indicating their belief that the jury is not free to consider mitigating factors not enumerated in the judge's instructions, contrary to *Lockett v. Ohio.* (Although question 1 was also designed to test comprehension on this issue, the answers to that question have been disregarded here and, where so indicated, elsewhere in this Report since Free's witnesses conceded that it does not have a clearly correct answer. Transcript (T.) 83–84, 135, 261–63.)

3. Forty-four percent in the 1990 survey and 63% in the 1992 survey answered question 3 incorrectly, indicating their belief that the existence of a mitigating factor bars the penalty of death, reflecting a failure to provide clear and objective standards to channel the jury's discretion and provide specific and detailed guidance which permits rational review, as required by *Godfrey v. Georgia.*

4. The answers to questions 12, 13, 14 and 15 disclose substantial confusion about who has the burden of proof on the appro-

priate sentence, creating an impermissible risk that the death sentence may be imposed arbitrarily and capriciously, in violation of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

5. Fifty-one percent in the 1990 survey and 56% in the 1992 survey answered question 16 incorrectly, indicating their belief that if a minority of the jurors vote against the penalty of death the jury should tell the judge that they cannot reach a unanimous verdict instead of signing the verdict form for a sentence other than death, reflecting a failure to provide clear and objective standards to channel the jury's discretion and provide specific and detailed guidance which permits rational review, as required by *Godfrey v. Georgia.*

The hearings held in January 1992 focused on the initial task specified in Judge Aspen's referral order, assessing the validity of the 1990 survey. Much of the testimony at those hearings dealt with similarities and differences between the 1987 IPI instructions used in that survey and the instructions actually used at Free's sentencing hearing. The court had earlier granted respondents' request for a two week recess in the hearing after the close of Free's case to enable respondents to prepare expert testimony. During the recess Zeisel conducted the 1992 survey substituting the actual Free instructions for the IPI instructions and correcting a typographical error in question 6.

The principal witnesses who testified were these:

—Hans Zeisel, professor emeritus, Law School of the University of Chicago. Law graduate of the University of Vienna, Fellow of the American Statistical Association, co-author with Harry Kalven, Jr., of The *American Jury* (1966), author of several empirical studies of jury behavior and numerous other publications listed in PX 1.

—Valerie P. Hans, professor of criminal justice and psychology, University of Delaware, Ph.D. in social psychology, author with N. Vidmar, of *Judging The Jury* (1986) and several articles on empirical jury studies and other publications listed in PX 6.

—Shari Seidman Diamond, professor of psychology and criminal justice, University of Illinois, Chicago, and Senior Research Fellow, American Bar Association, Ph.D. in social psychology and J.D., publications on jury studies and other subjects listed in PX 9.

—Judith N. Levi, professor, Department of Linguistics, Northwestern University, Ph.D. in linguistics, publications on language in the law and other subjects listed in PX 15.

—Peter E. Rossi, associate professor of econometrics and statistics, University of Chicago, Graduate School of Business, Ph.D. in econometrics, publications listed in PX 19.

—Paul J. Lavrakas, professor, School of Journalism, Northwestern University, Director of Northwestern University Survey Laboratory, Ph.D. in research psychology, publications listed in RX 8.

An agreed list of exhibits admitted in evidence was filed on March 10, 1992.

*Summary of Principal Testimony*

### Hans Zeisel

The 1990 Illinois Capital Jury Survey was initiated at the suggestion of David Bradford, an attorney with the McArthur Justice Center with a special interest in capital cases. The jury panels used in the survey were a random selection obtained from the Circuit Court assignment room just as they would be provided to judges and represented as good a probability sample of the jurors there as he could design. T. 23, 57. The confidence intervals (margins of error) in PX 3 are based on a 95% standard calculation and show the range of incorrect answers expected in 95 out of 100 repetitions of the test. T. 26–29. The percentages of incorrect answers summarized in PX 3, Table 1, are "massive". T. 34. The reliability of the results based on the sample of 96 jurors is supported by his split-half reliability analysis, PX 4, showing that when the sample is divided into two halves the answering patterns are nearly identical, thereby demonstrating the consistency of the survey results. T. 36–37. Based on his experience and research, the jury deliberation process would not do much to eliminate the very high levels of erroneous impressions shown in the survey results. T. 37–41.

#### Valerie P. Hans

In her opinion, based on her experience and review of the 1990 survey, that study is generally sound, the method adopted by Zeisel is one commonly used and generally accepted as an appropriate scientific method for examining juror comprehension and the sample was a reasonable one. The results show significant misunderstandings and fairly high levels of miscomprehension of the judicial instructions provided in the survey. Based on the 1990 survey results and her general knowledge about jury decision making, she believes that the *Free* jury more likely than not misunderstood the instructions given to them. T. 129–34, 168, 221–23.

#### Shari Seidman Diamond

In her opinion the methodology employed in the 1990 survey meets generally accepted criteria for valid jury research. T. 247–49. Based on the confidence intervals, the split-half reliability analysis, the pattern of results and the level of precision appropriate to the subject, the survey results are highly reliable. T. 257–58. She found no differences in the 1990 survey based on age or gender. Over 86% of the Witherspoon qualified jurors in that survey were white and the data show a high level of miscomprehension among those white jurors. T. 1079–81, 1083.

She also testified about the Diamond–Casper Study, PX 11, a preliminary report of a jury study conducted in the Cook County Circuit Court branch in Maywood, Illinois.[4] This study exposed prospective jurors to a videotape simulation of a murder trial, including IPI jury instructions for capital sentencing. The jurors then gave their decisions and answered multiple-choice questions intended to test, among other things, their recall and understanding of the instructions. One set of jurors was divided in two; half of the jurors were divided into jury panels and deliberated together for an hour and fifteen minutes before giving their decisions, while the other half did not deliberate before giving their decisions and answering the questionnaire.

#### Judith Levi

Professor Levi, a linguistics scholar with a special interest in the interaction between language and the law, testified about similarities and differences between the instructions used in the 1990 survey and the actual instructions in Free's case. Her comparisons of the two sets of instructions are set out in PX 16 and 17. She concluded, based on a linguistic analysis, that the IPI instructions and the instructions in the *Free* case were confusing on several key issues. Other portions of her testimony will be referred to in later discussion of specific issues.

#### Peter E. Rossi

In his opinion, the 1990 survey very clearly shows that the potential jurors surveyed were very divided and confused in their responses. He replicated the calculations of confidence intervals in PX 3, found no numerical errors and does not believe there are any conceptual mistakes in the application of statistics. His own analysis of the survey responses, set out in PX 20, utilized a 99% rather than a 95% confidence interval because of the seriousness of the issue. The result was to widen the confidence interval slightly. T. 632. The majority of the resulting confidence intervals do not range as high as 50% correct. Even as to the question with the highest confidence interval, question 4 (55–79%), "we are pretty sure that that population will not get that question right 80% of the time—as much as 80% of the time." T. 609–16.

He selected 10 questions for which there are unambiguously correct answers and calculated the number of respondents who got various numbers of correct answers. The result, also shown on PX 20, is that the average (mean) percentage correct is approximately 40%, with a confidence interval from 28% to 52%.[5] Also significant is the disper-

---

4. Because the results of that study could bear on the validity of the Zeisel study, PX 11 was admitted over the state's objection, since PX 11 was listed as an exhibit in the final pretrial order and Professor Diamond was subject to cross-examination on it both when it was initially introduced and after the resumption of the hearing. T. 280–81.

5. The ten questions were numbers 1, 2, 4, 5, 7, 8, 9, 10, 11 and 16. If question 1 is eliminated as ambiguous, we calculate the average percentage correct would increase from 40% to 41%. (Total number of correct answers reduced from 385 to 357, divided by 864 instead of 960 possible correct answers, equals 41.3%). If question 16 is also eliminated as ambiguous for the reasons

sion of performance across the sample, with 61 of the 96 respondents getting fewer than five questions correct, a "very uniform distribution shifted down towards low performance." T. 616–19.

Rossi also compared the distribution of correct responses actually observed with what would be expected under a random or "coin-tossing" view of respondent behavior. This calculation indicates that "the actual respondent distribution is very different from the expected distribution if the respondents were randomly selecting answers," PX 20, with "large numbers of people scoring systematically lower· than one would expect if they were engaged in a casual sort of random response behavior." T. 622. While a sample size of fifty is not accurate enough for judging the results of a presidential campaign where margins much less than 10% are important, the sample size here was entirely adequate for purposes of the Zeisel study. In his opinion the Zeisel survey is statistically sound and generalizable to the population as a whole. T. 624–25.

Rossi does not see any systematic subgroups of the survey respondents that either did well or did not do well. He sees rather a uniform pattern of consistent failure to get correct answers and fairly even dispersion across the types of answers. T. 644. To the extent there is systematic behavior the distribution responses are·tilted toward incorrect responses. Cook County is a heterogeneous population that would be expected to contain any subgroups that might be found elsewhere in Illinois. If there were a subgroup that did consistently better or worse, it would counsel caution in extrapolating the results to a different population that might not contain this subgroup in a similar proportion. Because no such subgroups appeared, Rossi was confident that the survey results could be extrapolated to other juror populations in Illinois. T. 645–48.

The Phase II (1992) survey results are virtually identical to the 1990 results. T. 722. The 1992 survey satisfies critical requirements for a proper survey. T. 723. The confidence intervals Rossi calculated on a 99% basis for the 1992 survey, with one

exception, overlapped with the similar confidence intervals he computed for the 1990 survey. While in most instances the percentages of correct answers to individual questions in the 1992 survey fell outside the 1990 survey confidence intervals, that may be accounted for by the fact that different instructions were used. The 1992 survey differed from the 1990 survey in that an error in question 6 had been corrected, making it usable in the 1992 survey. In the 1992 survey there was a noticeable subgroup of 13 persons with 8 out of 11 answers correct, creating a "spike" contrasting with the 6 persons who scored 7 correct and the 7 persons who scored nine correct. This could have been a result of chance variation. PX 25. Rossi testified that since there was "no large group of people that perform extremely well on this test" he believed that the survey could be applied to other juror populations. T. 727.

According to Rossi, what is important is not the comparisons for individual questions, but the aggregate number of correct answers as to which the findings of the two surveys are roughly consistent, T. 752–65, 770–73. A clear majority of the respondents score less than 50% correct based on an analysis of answers to the eleven questions listed in PX 25. Although on some questions the respondents did slightly better and PX 20 and 25 show an increase in the mean percentage of correct answers from 40 to 48, both numbers are far away from any high percentage.

Rossi·calculated a "paired sample T test" comparing the aggregate percentage of correct answers in the 1990 and 1992 surveys. That analysis on page 2 of PX 35 indicates that there is no statistically determinable difference between the aggregate percentage of correct answers in the two surveys. T. 1171. The weight of the evidence is "clearly that people are not able to answer these questions correctly in any ·consistent fashion." T. 727. Both surveys show that respondents do poorly on many of the questions. PX 35 corrects his wording about the overlapping of confidence intervals in PX 25. T. 1169–70. In his opinion the survey results

discussed in Part·6, the average number correct would remain at 41% (318 correct answers divid-

ed by 768 possible correct answers equals 41.-4%).

can be generalized to populations beyond the sample frame of Cook County eligible jurors because there is no large group of people that performs extremely well on the test. T. 726–27. He sees no reason to believe that there is any relationship between gender and comprehension. T. 747.

Paul J. Lavrakas

In his opinion, based on his experience as a specialist in research methodology and his review of the 1990 and 1992 surveys, both surveys were not rigorous from a methodological standpoint, there is insufficient evidence to conclude that the surveys measured comprehension and they do not justify any causal linkage between incorrect answers and a bias favoring the death penalty. There are too many uncertainties about the similarity of other counties to project the survey results beyond Cook County and the surveys have poor statistical validity. These opinions were based on Professor Lavrakas' analysis of four criteria for evaluating research which he referred to as construct validity, external validity, internal validity and statistical validity. Because his testimony is the basis for respondents' attack on the validity of the Zeisel surveys, that testimony will be described in more detail in the next section of this Report.

4. *Validity and Reliability of the Zeisel Surveys*

Construct Validity

The first issue raised by Professor Lavrakas was based on his analysis of construct validity, a criterion which asks whether a research instrument measures what it is claimed to measure, in this case, juror comprehension. T. 825–26. Lavrakas' conclusion that there is not sufficient evidence to conclude that the Zeisel surveys measure comprehension, T. 871, was based on two statistical tests he performed on the 1990 survey data. The first was a factor analysis which depicts patterns of consistency in correct and incorrect answers to the survey questions. The second was an internal consistency test known as Cronbach's Alpha. His factor analysis is explained at T. 843–61 and depicted in RX 5(a) and (b). His Cronbach Alpha calculation is explained at T. 862–65.

We do not believe these analyses significantly undermine the validity of the 1970 survey or, by inference, the 1992 survey. First, Lavrakas essentially conceded that, as Rossi and Diamond testified, it is not appropriate to apply factor analysis and a Cronbach's Alpha calculation to the Zeisel survey data because they are binary or dichotomous, i.e., answers to yes—no questions, as opposed to numbers on a continuum. T. 845–65, 926, 1221–24 (Lavrakas) T. 774–76, 1176–86 (Rossi), T. 1085–89 (Diamond). Lavrakas admitted that multi-dimensional questions— which we understand to mean questions that could turn on the understanding of more than one piece of information, or more than one step of possibly fallible reasoning—would reduce factorial consistency, T. 929, and further admitted that his factorial analysis did show consistency in the responses to some of the questions. T. 930–31, 937–38, 941. Lavrakas could not point to any specific flaws in the questions that would account for the lack of consistency he claimed to find, and acknowledged that the inconsistency could be a result of the subjects' lack of understanding. T. 944–49, 977.

Apart from technical reasons, Rossi explained that the use of factor analysis is logically inappropriate because any interpretation based on patterns of consistency is necessarily based on unverifiable assumptions about how heterogeneous the survey respondents are in their ability to comprehend the instructions. Lavrakas, who had the last word, offered no response to that observation.

Lavrakas' construct validity analysis is therefore rejected. The Zeisel surveys on their face appear to be designed to measure jury comprehension of capital sentencing instructions. The testimony of Zeisel, Hans, Diamond and Rossi supporting that conclusion is persuasive while Lavrakas' criticism is based on two types of statistical analysis which are inappropriate here.

External Validity

Lavrakas testified that the Zeisel surveys have poor or no external validity, i.e., they do not provide a basis for applying or generalizing the survey results outside the surveyed population, specifically to the *Free* jury. T.

871, 888. He based this opinion on demographic differences between the survey samples, the *Free* jury and the populations of Cook and DuPage Counties as to gender, age, education and race. RX 6. Diamond testified that, aside from the Witherspoon—death qualification questions, responses to none of the questions correlated with the respondents' gender. T. 1084. Lavrakas conceded that tabulation of the survey results by gender showed no consistent pattern of women answering the questions differently from men. T. 953–54. He did not tabulate the survey data by age and agreed that he had no empirical evidence suggesting that older people would be better able to comprehend the jury instructions than younger people. T. 954–55.

While RX 6 comparing persons more than 24 years [probably, of age] in the two counties shows higher percentages of high school graduates in DuPage County, no evidence was presented comparing the educational levels of eligible jurors in the two counties or those of the *Free* jury compared to the Zeisel survey subjects. What is more significant is that the survey data show high levels of miscomprehension and Rossi testified without dispute that the data show a uniform pattern of consistent failure to answer questions correctly and fairly even dispersion across the types of answers with no systematic sub-group doing well or poorly. On this evidence, we believe that the educational differences depicted in RX 6 do not represent a significant demographic variance for this purpose. As to racial demographics, Lavrakas ultimately agreed that race as a variable was not important in determining comprehension level. T. 1225–27 (Lavrakas) 1190–92 (Rossi) and 1080–83 (Diamond).

Internal Validity and Statistical Validity

Lavrakas testified that an inquiry into internal validity asks whether a study was designed and implemented to test a cause and effect relationship, T. 889–98, in this case, whether the survey results demonstrate a correlation between incorrect answers and the likelihood of voting in favor of the death penalty. PX 28. This criterion is not discussed further because, in our opinion, while the pattern of correlation reflected in PX 28 is suggestive, it does not provide a firm basis for any cause and effect conclusion. See T. 1198–99 (Rossi). For the same reason it is not necessary to discuss Lavrakas' testimony at T. 894–99, illustrated in RX 7, that the Zeisel study has weak statistical validity (compare Diamond's contrary testimony at T. 1093–1118) since Lavrakas' focus in that connection was also on whether the survey results support a causal inference relating incorrect answers and the likelihood of voting in favor of the death penalty.

Volatility

Lavrakas stated that the results of the 1992 survey suggested "volatility, variation in the numbers", T. 869, because the answers to most questions fell outside the confidence intervals predicted on the basis of the 1990 survey results. Beyond stating that it could be interpreted as a mark of inconsistency, · Lavrakas did not offer any explanation of volatility or the application of that concept to the survey data.

Zeisel and Rossi calculated confidence intervals differently. Zeisel calculated 95% confidence intervals based on percentages of incorrect answers, while Rossi calculated 99% confidence intervals based on percentages of correct answers. Eliminating questions 1, 13, 14, 15 and 16 as questions with no correct answers (see p. 9 supra, PX 3, Table I and Part 6 infra) and question 6, which was not included in 1990 results because of a typographical error, leaves 10 questions. Using Zeisel's confidence intervals, the 1992 results fell within predicted confidence intervals for 3 questions, fell slightly outside (1% to 2%) for 2 questions, outside by 4% to 6% for 3 questions and outside by 9% to 12% for 2 questions. Using Rossi's confidence intervals, the 1992 results fell within predicted confidence intervals for 3 questions, slightly outside for 1 question, outside by 5% to 8% for 5 questions, and outside by 12% for 1 question.

Rossi testified that it was inappropriate to compare individual questions in this way as a basis for inferences about the group. He viewed the purpose of the surveys as measuring comprehension "across the board", which he analyzed by determining the mean (arithmetic average) percentage of correct answers given by the survey respondents to the questions with unambiguously correct an-

swers shown on PX 20, 25 and 35. Measured in that way, the 1992 results (48%) fell within his predicted 99% confidence interval. T. 752–65, 770–73, 1171–73, 1216–17. Rossi also observed that (1) the differences in the results of the two surveys may be accounted for by the fact that different instructions were used (2) the ranges by which the 1992 results fell outside confidence intervals were "not very far" and (3) the levels of misunderstanding in both surveys were very high. T. 763, 770–73.

We do not agree with Rossi's premise that the primary importance of the Zeisel surveys is as evidence of comprehension of the instructions "in the aggregate". While the likelihood of misunderstanding on more than one issue is significant, our analysis necessarily focuses on the likelihood of misunderstanding with respect to specific issues on which the Constitution requires that the jury be given clear guidance. Nevertheless, the facts relating to confidence intervals do not, in our opinion, detract from the validity of either survey.

First, we put aside questions 12 to 15 dealing with the burden of persuasion. Except possibly for question 12, which we explain in Part 6 has a potential ambiguity, these questions do not have correct answers. As discussed more fully in Part 6 of this Report, the significance of the survey results for those questions lies in the extent of the disagreement among the respondents reflecting substantial confusion about the burden of persuasion.

As Rossi observed, the two surveys were not identical and the use of different instructions may account for some of the variations under discussion. What is more important is that the levels of misunderstanding shown in both surveys, with few exceptions, are very high and the levels of deviation in the 1992 survey from the results predicted are modest. Finally, there is no suggestion that confidence intervals are a critical test of validity. Lavrakas said only that the deviations "suggest" and "could be interpreted" as a sign of variation or inconsistency. For these reasons, and considering all of the evidence on validity, we conclude that the facts relating to confidence intervals do not detract from the validity of either survey.

Other Possible Sources of Error

The court has considered other possible sources of error suggested by Lavrakas but finds them unsupported. Inadvertence, fatigue and literacy problems, T. 839, are possibilities. Diamond testified that if fatigue had been a factor, one would expect the subjects to score better on questions coming earlier on the list, but she found no evidence of that. T. 1153–54. Lavrakas did not dispute Rossi's analysis showing that the actual distribution of responses was very different from the distribution expected if the respondents were randomly selecting answers. PX 20. Lavrakas criticized the surveys for the absence of internal consistency checks. However, he did not address the inclusion of multiple questions on three of the five topics, a more meaningful consistency check than those he suggested. T. 138, 206, 638. Finally, in criticising the surveys for inadequate documentation, he only specified the question whether the surveyed population was a representative sample of all persons eligible to serve as jurors in Cook County. T. 873. But he nowhere indicated what type of documentation on that point is needed in view of 1) the uncontradicted testimony of Zeisel and attorney James Bailinson, T. 1041–76, that the survey subjects were panels of persons summoned for jury duty at the Daley Center and previously grouped by jury officials in the same manner as groups sent to courtrooms for actual jury service and 2) the evidence summarized above that the demographic differences he stressed are not significant for this purpose. Reserved for later discussion is one other issue brought up by Lavrakas, the significance of the difference between taking a written test and the real life situation of jurors making an actual decision on life or death.

\* \* \*

The results of the Zeisel surveys are strongly corroborated by the fact that the two surveys were done under similar conditions, each with instructions modeled on the Illinois statute and each disclosing roughly similar levels of confusion. Those results also receive some support from the Diamond–Casper study. While that study differed in several ways from the Zeisel sur-

veys, the results of that study reflected in PX 11 are suggestive, apparently indicating, as the Zeisel surveys did, significant levels of misunderstanding among persons summoned for actual jury duty as to what are mitigating and aggravating factors and how they should be considered.

The results of the Zeisel studies are consistent with other studies of juror comprehension. Where jury instructions have been based upon statutes and appellate court decisions with no attempt to rewrite them for better comprehension, every empirical study has shown a startlingly low level of comprehension. The literature on such studies is summarized in W. Steele and E. Thornburg, *Jury Instructions: A Persistent Failure to Communicate*, 67 N.C.L.Rev. 77, 83–87 (1988). They conclude,

> Many lawyers and judges simply do not believe that juror confusion is a serious problem. Since they understand the instructions, they believe that jurors understand them as well. This position, however, is not supported either by empirical research or case law. None of the studies that have been done show that jurors understand their instructions at an acceptable level. On the contrary, all of the empirical studies show juror comprehension of pattern instructions to be so low as to be dysfunctional.

*Id.* at 98–99. It is in capital sentencing, where clear guidance is required by the Eighth and Fourteenth Amendments, that the problem is one of constitutional significance.

We conclude that the Zeisel surveys are valid, meaning that within standard margins of error the survey results are true, that is, they fairly represent the levels of comprehension of the survey respondents regarding the capital sentencing instructions used in those surveys.[6]

### Reliability of the Zeisel Surveys

Are the Zeisel survey results reliable? In other words, is it reasonable to apply those results to persons other than the survey re-

spondents, for example, persons participating in replications of those surveys in Cook County or DuPage County or the *Free* jurors themselves? For the reasons discussed above, we find Lavrakas' testimony on external validity unpersuasive, and accept Rossi's testimony that it is reasonable to make inferences about the comprehension of other jury populations in Illinois based on the survey results because of the magnitude of the results and the fact that no sub-group in the surveys performed well. T. 645–48, 1191–92. The court also accepts Rossi's testimony that whatever differences exist between DuPage County jurors and the survey respondents are unlikely to produce significant differences if the same surveys were done under similar conditions in DuPage County. We conclude that if the same survey instruments were used with prospective jurors in the DuPage County Courthouse under conditions like those in the Daley Center surveys, it is reasonable to expect similar results showing substantial levels of misunderstanding of the IPI instructions and the capital sentencing instructions used in the *Free* case.

As Judge Aspen observed, the Zeisel survey evidence is offered to establish a basis for invalidating certain aspects of the Illinois statutory scheme under which Free was sentenced. If the statute is invalidated on the grounds asserted that would call into question the constitutional reliability of the sentence Free received. *Free*, 778 F.Supp. at 436. That issue is addressed in Part 6 of this Report. However, the parties have also debated the question of what do the Zeisel survey results tell us about the *Free* jury itself? Did the *Free* jury misunderstand the capital sentencing instructions as the survey subjects did?

The *Free* jury differed from the Zeisel survey respondents in three important ways. They made an actual life or death decision, they deliberated as a group instead of separately answering written questionnaires and they made their decision after a trial and sentencing hearing in which they heard ag-

---

6. We reject respondents argument that the 1992 survey should not be considered because it was done to correct Zeisel's "error" in using the IPI instructions rather than the actual *Free* instructions in the 1990 survey. Once the respondents challenged the applicability of the 1990 survey because of claimed differences between the two sets of instructions it was appropriate for Free to present the 1992 survey to rebut that contention.

gravating and mitigating evidence and arguments by the prosecutor and Free's attorney which discussed how the jury should decide on the sentence. To what extent do the Zeisel survey results or other evidence in the record support inferences about the level of comprehension or confusion of the *Free* jury with respect to constitutionally significant aspects of that decision? The Zeisel surveys themselves were not designed to study those questions. The pertinent evidence consists largely of opinions expressed by several witnesses, in some instances relying on other studies.

While the *Free* jurors' participation in an actual life or death decision was obviously a very different experience than that of the survey respondents, there is no evidence or reason to believe that participation in an actual decision would have increased *comprehension.*

Whether deliberation as a group and hearing evidence and attorneys' arguments would be likely to reduce confusion and misunderstanding is a more difficult question. The respondents cite the observation in *Boyde v. California,* 494 U.S. 370, 380–81, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990), that,

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process with common sense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

See also *Lockhart v. McCree,* 476 U.S. 162, 171, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137 (1986), expressing serious doubts about the value of studies of randomly selected individuals in predicting the behavior of actual jurors. Free, however, points to expert testimony and empirical proof which he says show that deliberation and attorneys' closing arguments would be ineffective to cure the levels of miscomprehension shown in the Zeisel surveys.

Zeisel did not believe that the deliberation process would do much to eliminate the misunderstandings shown in the 1990 survey for two reasons. First, they are very high. Second, the judge's instructions are the last thing the jurors hear and the Illinois capital sentencing instructions are not styled to give the jurors definitions likely to lead to discussion about whether the facts fit those definitions; rather the instructions are largely advice about how to articulate the elements which weigh for life or death. Zeisel's "guess" is that most of the jurors will have made up their mind to vote for death or for life by the time they commence deliberations. T. 37–41.

Zeisel cited studies which found that the importance of the deliberation process is probably over-estimated, based on interviews with real jurors showing that in one-third of the cases jurors are unanimous on the first ballot and 90% of the verdicts in the remaining cases went in the direction of the first ballot majority. Zeisel was not asked directly about the extent to which the attorneys' arguments in the *Free* case may have reduced the levels of misunderstanding he thought would result from the judge's instructions. However, Zeisel did state his opinion that because the judge's instructions are the last thing jurors hear before deliberating, with small corrections which might arise during the deliberation process, the jurors will apply the misunderstandings shown in the survey results to their decision. T. 91. Nevertheless, in discussing the difference between simulated and actual decisions he was careful to note that it is a question of common sense judgment whether the simulation in the 1990 survey "is close enough to allow inferences to the real [world]". T. 98–99.

According to Hans, the 1990 survey results suggest that the *Free* jury more likely than not had significant problems understanding the instructions they were given. T. 221–22. In her opinion that survey is applicable to the *Free* jury. However, she also believed that the defense attorney's argument that there is no hung jury in a penalty phase decision together with the presence of the two verdict forms in the jury room might have provided additional guidance and survey question 16 therefore might not apply to the *Free* jury. T. 156. She thought that deliberation would have a slight, if any, impact on enhancing juror comprehension, T. 163–66,

citing a study indicating that jurors frequently correct each others' factual errors but are less likely to correct errors about judicial instructions. Phoebe C. Ellsworth, *Are Twelve Heads Better Than One?*, 52 Law & Cont. Prob. No. 4, 205 (1989).

According to Diamond, the Diamond–Casper Study shows a modest improvement in accuracy associated with deliberation in some cases with a drop in accuracy associated with deliberation in one case out of seven. PX 11 at 10, T. 306. But elsewhere Diamond has written, "it seems hazardous to draw pragmatic inferences about jury functioning based on studies that have only examined individual decisions made by noninteracting jurors." Weiten & Diamond, *A Critical Review Of The Jury Simulation Paradigm*, 3 Law & Human Behavior, 71, 79 (1979).

The studies Zeisel relied on involved conventional juries instructed to resolve factual disputes and reach unanimous verdicts on questions of guilt or liability, a task which Zeisel recognized was very different from the task of a capital sentencing jury. Professor Ellsworth cautioned that because of the small sample size in her study, statistical analysis of the data would be misguided. 52 Law & Cont.Prob. No. 4 at 208. Moreover, the deliberating groups in that study decided issues of guilt or innocence and operated under a one hour time limitation which Ellsworth thought probably resulted in an incomplete picture of the deliberation process. *Id.* We do not view the data from the Diamond–Casper study as sufficiently strong or clear to support any general finding about the extent to which the jury deliberation process is likely to reduce misunderstanding.

No research studies were cited which attempted to separately measure the effectiveness of attorneys' closing arguments in improving juror understanding. Free cites the comment in *Boyde* that "arguments of counsel generally carry less weight with a jury than do instructions from the court," 494 U.S. at 384, 110 S.Ct. at 1200, and the instruction to the *Free* jury that attorney's arguments are not evidence. Sentencing Transcript, Pretrial Order Exh. F (Sentencing Tr.) at C8443. Respondents however note that the judge also told the jury that "arguments are made by the attorneys to discuss the facts and circumstances in this case which bear upon the question of whether the death sentence should be imposed". *Id.* at C8442.

We find that the evidence on the likely effect of deliberation and attorneys' arguments in reducing misunderstanding is sketchy and inconclusive. That evidence is not strong enough to rule out the possibility that comprehension among members of the *Free* jury on some key issues may have been substantially aided by hearing the evidence, the arguments of the attorneys and by the process of deliberation. The likely effectiveness of those factors, we think, should be assessed after a closer analysis of the issues on which a likelihood of misunderstanding is claimed. We return to that analysis in Part 6 of this Report.

5. *Procedural Default*

Judge Aspen rejected respondents' argument that Grounds 10 and 14 were procedurally barred. He first found that those claims were fairly raised in Free's direct appeal. Alternatively, Judge Aspen concluded, those claims are not barred because Free has shown cause, that the Zeisel survey evidence was unavailable to Free at the time of his state court petitions.

> It is unrealistic to suggest that Free's counsel should have expended both the time and resources necessary to independently commission the study and develop the empirical evidence to support his claim on direct appeal.

*Free v. Peters,* 778 F.Supp. at 436 n. 3. We will discuss the evidence developed at the hearing which bears on that alternative ruling, observing that the requirement for a showing of cause, "that the factual or legal basis for a claim was not reasonably available to counsel", *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986), now applies to Judge Aspen's first holding as well. For the Supreme Court has recently ruled that one who raises a claim in state court, but fails to develop the factual predicate for it, must show cause and prejudice before he will be permitted a new hearing in federal court.

In *Keeney v. Tamayo–Reyes,* —— U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992),

the petitioner, a Cuban immigrant who had pleaded guilty to manslaughter, alleged in a state post-conviction proceeding that the translator had not explained to him the nature of the plea agreement or the *mens rea* required for manslaughter. After a hearing the state court dismissed his petition. He then brought a habeas petition in federal court. The district court determined that his counsel's failure to adequately develop the facts concerning the alleged mistranslation was due to inexcusable neglect, no evidentiary hearing was required and dismissed the petition. The Ninth Circuit reversed, holding that under *Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), and *Fay v. Noia,* 372 U.S. 391, 438, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963), the petitioner was entitled to a new hearing in federal court unless his counsel had "deliberately bypassed" available state court remedies.

■ The Supreme Court reversed, overruling *Townsend* and holding that a habeas petitioner must show cause and prejudice for his failure to adequately develop the evidentiary basis for his post-conviction petition in state court before he will be entitled to an evidentiary hearing in federal court. Thus, even though Free raised his claims on direct appeal, before he is entitled to introduce new evidence in support of those claims, he must show cause for his failure to introduce it in his state post-conviction proceedings or his direct appeal.

■ Free argues that *Tamayo–Reyes* does not apply because in *Tamayo–Reyes* the habeas petitioner alleged that his state court evidentiary hearing was inadequate, while Free never had one. Pet.Obj. to Resp. Findings of Fact at 7. But Free never asked for one. According to *Tamayo–Reyes,* it is irrational to distinguish between failing to develop a factual record before the state courts and failing to raise a claim at all, — U.S. at ——, 112 S.Ct. at 1719, 118 L.Ed.2d at 328, and therefore the cause and prejudice standard applies. It is clear from *Tamayo–*

*Reyes* that the deliberate bypass standard of *Fay v. Noia* is dead. Henceforth the cause and prejudice standard will apply to the introduction of *any* new matter in a federal habeas petition—whether evidence or legal theory—that was not previously presented to the state courts. Thus *Tamayo–Reyes* may prevent our considering the Zeisel studies— or any other evidence not first presented to the state courts—unless Free can show cause and prejudice.[7]

The Court in *Tamayo–Reyes* stated that, as under *Murray,* 477 U.S. at 488, 106 S.Ct. at 2645, "[a] showing that the factual or legal basis for a claim was not reasonably available to counsel," would constitute cause excusing the petitioner's failure to develop evidence in state court proceedings. *Tamayo–Reyes,* — U.S. at —— n. 5, 112 S.Ct. at 1721 n. 5, 118 L.Ed.2d at 330 n. 5. Free has alleged, and Judge Aspen found, that the evidence contained in the Zeisel studies was not reasonably available to his counsel in state court. We now turn to the evidence on this point brought out at the hearing.[8]

■ The history of the Zeisel study was as follows. Professor Zeisel testified that David Bradford, a lawyer working for the McArthur Justice Center, T. 60–61, approached him, and stated that he believed that the Illinois jury instructions for capital sentencing were "misguided" and possibly unconstitutional, and asked whether Zeisel could design a study to test this. T. 18–19. Zeisel could not remember when Bradford first came to him. T. 54. Bradford and Zeisel shared an opposition to the death penalty. T. 46. "They" (presumably Bradford and his associates) wanted Zeisel to use the facts of the Free case, and Bradford provided a trial transcript and a set of jury instructions, which Zeisel understood to be the Illinois pattern jury instructions. T. 23, 53–54. Zeisel worked with Bradford in designing the questions for the survey. Bradford raised points where he thought jurors might be misled, and together they designed questions

---

7. Because we conclude that Free has shown cause we need not consider the court's discretion to hold an evidentiary hearing even if cause is not shown, noted in Justice O'Connor's dissent in *Tamayo–Reyes.* —— U.S. at ——, 112 S.Ct. at 1727, 118 L.Ed.2d at 338.

8. The second element of the cause and prejudice test, actual prejudice resulting from the default, turns on the applicability of the Zeisel survey evidence to the *Free* jury itself, discussed in Part 6 of this Report.

to test these hypotheses. T. 60–61, 84–85. When counsel pressed Zeisel to explain why the facts of the Free case, and only the Free case, had been used in preparing the survey, he replied:

> Because I understood and still understand that such questions under American law are not decided in the general rule but in connection with one particular case. I mean, the law on voir dire is not established generally by the United States Supreme Court, but in Witherspoon versus Illinois. So I thought they want to have this issue of instructions decided in connection with the Free case.

T. 86. Zeisel acknowledged that he could have performed the survey at any time. T. 87. After the respondents emphasized at the initial hearings here that Zeisel had not used the exact instructions given to Free's jury, Zeisel repeated the study using those instructions.

From this respondents conclude that Free and his attorneys could have carried out the same study at the Daley Center each year from 1979 to 1989. Respondents suggest that Free deliberately bypassed the opportunity to develop these facts for adjudication in the state courts and that those facts were thus reasonably available to Free during the time he was litigating his direct appeal and post-conviction petitions in the Illinois courts.

The testimony shows, however, that the Zeisel studies were not commissioned by Free or his attorneys. There is no evidence that Free's attorneys had any involvement in the creation or conduct of the 1990 Zeisel study, except for granting permission to Zeisel to use the facts of the Free case. T. 4. Further, we find no basis for respondents' assumption that Free's attorneys would have been able to gain access to the Cook County Circuit Court jury panels which the Chief Judge granted to Zeisel, a highly regarded and independent expert in empirical jury studies.[9] Nor is there any evidence that an academic expert in jury research, like Zeisel, would have been available at Free's request to conduct such a survey.

9. In an affidavit filed on March 10, 1992, Kimball R. Anderson, counsel of record for Free, states that in January 1992 he sought permission from the Chief Judge of the Circuit Court of the Eighteenth Judicial Circuit, DuPage County, Illinois, to conduct a survey under the direction of Professor Zeisel using persons called for jury duty in DuPage County. That request was denied by the Chief Judge of that court on February 10, 1992.

It does appear that Bradford and Zeisel expected to make the results of the 1990 study available to Free's attorneys for use in their efforts to overturn his death sentence. Nevertheless, the record supports Free's contention that the study was entirely independent, with nothing to indicate that Bradford or Zeisel acted in response to any direction or request from Free's attorneys.

We conclude that the Zeisel survey evidence was not reasonably available to Free's attorneys during the state court proceedings. Free has shown that the Zeisel surveys were independent research. Respondents have not rebutted that showing. It is unrealistic to think that Free's attorneys could have carried out such research on their own or, if they did, that the results would be entitled to the weight appropriately due to research findings of Zeisel, a scholar of unquestioned objectivity.

6. *The Impact of The Zeisel Survey Evidence on Free's Grounds for Relief, 5, 10 and 14*

The question posed by Judge Aspen is whether the Zeisel survey evidence calls for reconsideration of the empirical assumptions about juror comprehension which served as the predicate for the pertinent rulings in *Silagy* and *Williams*. *Free v. Peters*, 778 F.Supp. at 434–35. The parties have also debated whether the findings of the Zeisel surveys can be applied to the *Free* jury itself. In order to answer both of those questions we undertake a closer analysis of the specific issues on which the survey evidence shows substantial misunderstanding.

Requirement that Jurors Agree on Presence of Mitigating Factors

■ Questions 4 and 5 of the Zeisel studies were designed to test whether jurors believe they cannot spare the defendant on the basis of a mitigating factor unless all of the jurors agree that the mitigating factor may be used. They read as follows:

4. A juror decides that the fact that Mr. Wood was only 25 years of age when he committed the murder is a mitigating factor sufficient to preclude the death penalty. However the other eleven jurors disagree and insist that his age is not a mitigating factor. The one juror believes that she cannot consider a mitigating factor unless the entire jury agrees upon it and votes for the death penalty. She votes for the death penalty.

5. A juror decides that the fact that Mr. Woods was good to his family is a mitigating factor sufficient to preclude the death penalty. However, the other eleven jurors disagree. The other jurors insist that no juror should consider the defendant's good relations with his family as a mitigating factor unless they all agree it is a mitigating factor. The one juror accepts this approach and votes for the death penalty.

In the 1992 survey 15% of the subjects answered question 4 incorrectly, while 30% answered question 5 incorrectly, in each case stating that the juror had followed the judge's instructions. In the 1990 survey 25% and 36% respectively answered those questions incorrectly.

Respondents argue that the *Free* jury instruction,

> If, from your consideration of the evidence and after your due deliberation, there is at least one of you who finds that there is at least one mitigating factor sufficient to preclude the imposition of the death sentence, then you should return a verdict that the Defendant be sentenced to imprisonment.

C8443–44, is clearer than the closest IPI instruction,

> If you do not unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude the imposition of a death sentence, then you should sign the verdict requiring the court to impose a sentence other than death.

PX 2 at 12. The drop in incorrect answers to questions 4 and 5 in the 1992 survey which used the actual *Free* instructions provides some support for respondents' contention.

What is more significant is that there is a good possibility that deliberation would improve a jury's understanding with respect to this issue. It is reasonable to suppose that a juror would have some resistance to being told that he cannot consider a mitigating factor unless all the others agree. The survey data indicates that a majority of the jurors are likely to have it right. We think they would tell the mistaken jurors (assuming that the question is raised) that they can consider a mitigating factor whether or not the others agree. It seems unlikely that the mistaken jurors would accept the opinion of a minority on this point.

The closing arguments provided some assistance to the *Free* jurors on this point. *Free's* counsel told the jury in no uncertain terms that each juror was to decide individually whether he or she had found a sufficient mitigating factor or factors:

> There is no hung jury, so to speak, in a capital situation.

> ... [y]ou are going to receive instructions that tell you very explicitly that all of you must agree, right down to the last one, unanimously, that there are no mitigating factors, there is nothing here in James Free of a mitigating nature that reflect on the death penalty before you can say to the Court—and your determination is mandatory—"Your Honor, sentence him to death."

> You all have to agree on that.

> Yet again, ladies and gentlemen, the other verdict form that you will receive says that we cannot unanimously agree.

> Ladies and gentlemen, in the instructions you will find the statement that if just one of you—just one of your twelve finds among all of the situation in the evidence that you have heard that the death sentence should not be imposed, if just one of you, the rest of you must respect that.

> You must. That's the law.

> That person or persons or group of you doesn't have to convince all of the others that the sentence not be imposed. Not at all.

> After your due deliberations, if just one, two or three of you say, 'I'm sorry, I find in James Free, and his background and in

the circumstances, and in the law, that I am given a mitigating factor that impresses me enough not to give the death penalty', the rest of you must abide by that.

And in signing the verdict that says you cannot unanimously agree you are not saying, "We agree with that person."

You are merely saying, "One of our twelve, or more, cannot impose it because that person finds in this situation, from his or her own mind, conscience, background, values, that it not be imposed.

Sentencing Tr. at C8417–19. At the end of his argument, Free's counsel reinforced the point that each juror individually had the power to spare Free:

I ask you now to go back and to search these [mitigating factors?] and to search yourself and your mind and your heart and your individuality, and I submit that when you do that ... that you will say, "There are mitigating factors, you are a person, I am not going to tell the Court to sentence you to death."

If any one or more of you feel that way the other should respect that and sign the verdict [stating that you cannot unanimously find that there are no mitigating factors precluding the death penalty].

Sentencing Tr. at C8438–39.

Both sides agree that we should be guided by the holding in *Boyde* that in dealing with a claim that a capital sentencing instruction is ambiguous and subject to an erroneous interpretation, the proper inquiry is,

whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that a jury was more likely than not impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition.

*Boyde*, 494 U.S. at 380, 110 S.Ct. at 1198. For the reasons discussed above, we conclude that Free has not shown a reasonable likelihood that either jurors generally or the jurors in his case would have misunderstood the instructions as requiring unanimous agreement on the existence of mitigating factors, precluding the individual jurors from considering relevant mitigating evidence.

### Non-Statutory Mitigating Factors

■ Questions 2, 6, 7, 8, 9, 10, and 11 were designed to determine whether the test subjects believed that they could consider as mitigating factors only those factors listed by the judge or those "comparable" to them. We list these questions with the percentage of incorrect answers found by Zeisel in 1992 in parentheses and found in 1990 in brackets:

2. A juror is persuaded that the fact that Mr. Woods was good as a boy is a mitigating factor sufficient to preclude the death penalty. However, she notes that being a good child is not one of the mitigating factors which the judge specifically mentioned. She also believes that being a good child is not an excuse for the murder which is comparable to the other mitigating factors which the Judge specifically mentioned. For this reason, she concludes that she has no choice and must vote for the death penalty. (40%) [56%]

6. A juror decides that Mr. Woods was not under the influence of an extreme emotional disturbance when he committed the murder, but that he did suffer from a mild emotional disturbance at the time of the murder. She concludes that the judge's instructions required that an emotional disturbance be an "extreme" disturbance in order to be a sufficient mitigating factor, and thus a mild emotional disturbance cannot be a mitigating factor sufficient to preclude death. She votes for the death penalty. (59%) [error invalidated this question in Zeisel 1990].

7. A juror decides that the fact that Mr. Woods did not kill more than one person is a reason sufficient not to sentence him to death. However, she also concludes that this fact is not one of the mitigating factors which the judge specifically mentioned. She also does not believe this fact provides a reason to spare the defendant's life that is comparable to any with the mitigating factors which the judge specifically mentioned. She concludes that as a result she must vote for the death penalty and does so. (50%) [65%]

8. A juror decides that the fact that Mr. Woods did not actually rape either of the women is a mitigating factor sufficient to preclude the death penalty. She votes against the death penalty. (52%) [66%]

9. A juror decides that Mr. Woods had a significant criminal record. However, the juror also concludes that the fact that none of Mr. Woods prior crimes was violent is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty. (39%) [47%]

10. A juror decides that Mr. Woods will never be rehabilitated to useful citizenship. But she also decides that Mr. Woods may be rehabilitated enough to be a safe and obedient prisoner. She concludes that this is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty. (58%) [58%]

11. A juror decides that the fact that Mr. Woods very much regretted what he did is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty. (57%) [68%]

These percentages are high—50% or more for all but question 9 and question 2 in 1990. In such a case, when there is a reasonable probability that the majority is misled, we question whether deliberation would have helped a jury overcome the misconception.

It is not difficult to see the source of this misunderstanding. The IPI instructions state that mitigating factors include the five factors listed in the statute and "any other reason supported by the evidence why the defendant should not be sentenced to death." The *Free* jury was told that "mitigating factors include, but are not limited to, the following circumstances." The test subjects, and the *Free* jury, may well have wondered why, if they could consider anything at all in mitigation, the judge instructed them on only specified items. As Dr. Levi testified, when people are presented with a category with which they are not familiar (e.g., "mitigating circumstances") they will look for examples for guidance. Tr. 518, 541, 543–44.[10] Trying to make sense out of the instructions, a jury

could reasonably conclude that while there could be other mitigating factors, they would have to be similar in some way to the listed ones—the same common-sense idea underlying the doctrine of *ejusdem generis*. Here, intelligent deliberation might well lead them to the wrong answer.

In addition to the instruction quoted in the last paragraph, the *Free* jury was also told to consider any other mitigating factors present in the case. C8443. The IPI instructions stated that mitigating factors may be found in any evidence presented during the trial or the death penalty hearing and that mitigating factors include those enumerated and any other reason supported by the evidence why the defendant should not be sentenced to death. PX 2 at 10, 11–12. We find no material difference between the two sets of instructions on this point. The high percentages of incorrect answers to the questions in this category in both the 1990 and 1992 Zeisel surveys support this finding.

Respondents argue that the *Free* jury had sufficient additional information to help them make sense of the instruction, pointing to statements made in closing argument that the jury could consider other mitigating factors. The prosecutor stated:

> But you are not limited just to those two [statutory factors], and you are not limited to aggravating factors. This is, to be somewhat colloquial, a pretty wide open consideration.
>
> It is important that it is because this is a consideration that you as humans are making based on the facts of this case and it should be a very wide open situation.
>
> So anything which the Defendant would offer in this case which truly provides a reason for imposing a less severe sentence should be considered by you if it does do that.
>
> \*   \*   \*   \*   \*   \*
>
> I will talk about some of those [aggravating and mitigating factors], but you will probably be able, between yourselves, to

---

**10.** It is not necessary to address respondents' contention that the court should eschew reliance on the expert linguistic analysis of Professor Levi. Our conclusions about the meaning and significance about the pertinent instructions are based on our reading of the language; at the same time we find Professor Levi's analysis helpful.

think of some that I won't even mention, that maybe I haven't even thought of.

So you should keep in mind that although we don't mention them there may be factors in your own mind that you will wish to consider in this respect, and you should.

Sentencing Tr. at C8366–67. Asked whether this would have been helpful, Professor Levi acknowledged, "If they understand that they can rely on this statement of the law, and if they remember it when they get to the time of deliberation, yes, it could be helpful. It would have been better if the Judge had said something like that." T. 582.

Free's attorney also spoke to the variety of mitigating factors the jury could consider, but it seems to us he made the matter worse, not better:

But I have got to tell you that there are three kinds of mitigation.

One of them you are going to get directly out of the statute, and that is in 9–1, which is the criminal section that we have been working under.

You will receive two of five mitigating circumstances. The other three just won't apply to this particular case at all.

But the two that you are going to be instructed to consider is the fact that [the defendant had no significant criminal history and was suffering from an emotional disturbance].

Then, ladies and gentlemen, you are going to be told in that same instruction that mitigating factors include but are not limited to—and Mr. Knight [the prosecutor] acknowledges that there are other statutory mitigations found in other sections.

Then there are other mitigating circumstances that are just found in the case law as pronounced by our Supreme and Appellate Courts.

Sentencing Tr. C8426–27. A juror hearing this would surmise that the judge was going to instruct the jury by giving a list of factors other than the two he mentioned—mental disturbance and the lack of significant criminal history. Free's lawyer continued to list other factors he claimed were supported by other statutes and case law:

One of them is strikingly similar to the one I just talked about [mental disturbance

from drug use], and that is that there were substantial grounds tending to excuse or justify the Defendant's criminal conduct, although failing to establish the Defense.

It is the same as the last.

\*   \*   \*   \*   \*   \*

Another factor in another section is that the Defendant had no history of prior juvenile delinquency.

\*   \*   \*   \*   \*   \*

Another is that he led a law abiding life for a substantial period of time before the commission of the present crime.

\*   \*   \*   \*   \*   \*

Also, that the circumstances are unlikely to occur [recur].

*Id.* at C8430–31. Free's lawyer then interrupted his list to explain that all of these factors were valid mitigating factors, even though the court would not instruct the jury on them.

Another statutory [sic] mitigating factor, ladies and gentlemen, you are to consider—and because I say them and they are not followed back in the papers that you take with you doesn't mean that they are not valid and you should not consider them, because if they weren't valid and you should not consider them Judge Hopf would be stopping me this moment from listing these and telling you about them.

*Id.* at C8432. He then continued with his list of possible mitigating factors, but again interrupted his list to attempt to explain that all of these could be considered:

Besides the statutory mitigations there are cases that are replete with factors that you should consider.

You may say that this is tremendously broad, and Mr. Knight acknowledges that these factors are broad, but they do exist.

Any one of these, ladies and gentlemen, can excuse the imposition of the death penalty if you so find it.

*Id.,* at C8433. Free's attorney then resumed his listing of possible factors.

We think this presentation would not have significantly improved the ability of Free's jurors to understand that the list of mitigat-

ing factors is not limited to statutory factors or those somehow comparable to them. First, some of the factors raised by Free's counsel *were* closely related to the statutory factors. Free's counsel noted that "substantial grounds tending to excuse or justify the Defendant's criminal conduct" was "strikingly similar" to the "extreme emotional disturbance" factor. No history of prior juvenile delinquency and a law abiding life before the commission of the crime are obviously related to a lack of significant criminal history.

Second, Free's counsel's presentation of the list was confusing. Because Free's counsel was afraid that the jury might not accept as legally valid the mitigating factors he was offering, he emphasized that they were found in statute and case law. As a consequence, the jury might have thought that in order to follow the law they had to remember Free's counsel's exact list, or that they were related to the statutory factors.

The jurors may have had difficulty accepting the idea that a lawyer can teach them about "the law" to an extent going beyond the judge's instructions. We do not believe that counsel's arguments would have made it clear to Free's jurors that they were free to consider anything that they considered mitigating, whether or not it was somehow related to one of the statutory factors told to them by the judge.

The state contends that the situation here is analogous to *Boyde,* where the jury was erroneously instructed that only mitigating factors related to the circumstances of the crime could be considered. When Boyde appealed, claiming that the jury had been precluded from considering his background and character, the California Supreme Court found that the jury would have understood that they could consider evidence of Boyde's character apart from the circumstances of the crime. The court noted that Boyde had introduced considerable evidence as to his background and character, his counsel had argued at length for leniency based on that evidence, and the jury was never told to disregard it. The Supreme Court affirmed:

> All of the defense evidence presented at the penalty phase—four days of testimony consuming over 400 pages of trial transcript—related to petitioner's background and character, and we think it unlikely that

reasonable jurors would believe the court's instructions transformed all of this "favorable testimony into a virtual charade." [citation] The jury was instructed that it *"shall consider all of the evidence* which has been received *during* any part of the trial of this case," [citation] and *in our view* reasonable jurors surely would not have *felt constrained by the factor* (k) instruction to ignore *all* of the evidence presented by petitioner during the sentencing phase.

494 U.S. at 383, 110 S.Ct. at 1199.

We do not believe this was true of the *Free* jury. The mitigating evidence Free offered is not before us, but it appears from Free's counsel's argument and *Free,* 447 N.E.2d at 243, 69 Ill.Dec. at 26, that he offered testimony of Free's good reputation, work record, military history and non-violent character. This would have been relevant to the statutory mitigating factor of emotional disturbance—which Free's counsel argued, without objection, was applicable to Free's claim that he was intoxicated at the time of the crime. The testimony showed that Free's normal self was not violent; therefore he must have been suffering from a mental disturbance when he murdered Bonnie Serpico.

Because much of the evidence would have been arguably relevant to a statutory mitigating factor, Free's jury was not in the same position as the jury in *Boyde;* If Free's jury believed that mitigating factors were limited to the statutory ones or something closely resembling them, the presentation of evidence of his work history and personality would not have appeared to have been a waste of time. Without having to face the contradiction, the jury would not have been forced to correct its misunderstanding. After considering the high levels of misunderstanding reflected in the Zeisel survey results and the additional information about what happened at the sentencing hearing, we conclude that there is a reasonable likelihood that a substantial number of jurors who received the IPI instructions and of Free's jurors believed that only the statutory mitigating factors, or factors comparable to them, could preclude the imposition of the death penalty.

*Whether Existence of a Mitigating Factor Mandates Life*

Question 3 of the Zeisel studies was designed to determine whether jurors would believe that the presence of a *statutory* mitigating factor automatically precludes the death penalty. Question 3 reads as follows:

3. A juror decides that Mr. Woods was under the influence of an extreme emotional disturbance at the time he committed the murder. She decides that this fact is not a sufficient mitigating factor to preclude the death penalty and votes for the death penalty.

In 1992 63% of the survey subjects and in 1990 44% of those subjects answered incorrectly that the juror had not obeyed the instructions.[11] The weight of this evidence is lessened because there was only one question exploring this area of misunderstanding. We think that the significance of this evidence is that it offers some support for the conclusions we reach below about the "sufficient to preclude" language and burden of persuasion issue.

*The Proper Verdict For a Non–Unanimous Jury*

Question 16 reads as follows:

16. After deliberating for two days, nine jurors are convinced that death should be imposed. Three jurors believe death should not be imposed. The jurors are all convinced that they will not change their mind. Read the following three statements and check the one which best describes, under the judge's instruction, what the jury should do: (a) All sign the verdict form "we, the jury unanimously find that there are no mitigating factors sufficient to preclude the imposition of a death sentence." (b) All sign the verdict form, "we, the jury, do not unanimously find that there are no mitigating factors sufficient to preclude a death sentence." (c) Tell the judge they cannot reach a unanimous verdict.

In 1992 56%, and in 1990 51%, of the survey respondents checked (c), viewed by Zeisel as an incorrect answer. While (b) is clearly a correct answer, (c) may also be correct since the inability to reach a unanimous verdict is equivalent to a decision against the death penalty. Moreover Hans testified that the defense attorney's argument that there is no hung jury in a penalty phase decision together with the presence of the two verdict forms in the jury room would have provided additional guidance on this point. Tr. 156. It is true that (c) might also reflect the mistaken view that a verdict for a sentence of imprisonment must be unanimous. Given the potential ambiguity of the question and the fact that this was the only question designed to test understanding on this issue, we do not believe that *Free* has shown a reasonable likelihood that the sentence in his case was based on whatever misunderstandings are reflected by the answers to Question 16.

*The Burden of Persuasion*

*Free* argues that his sentence is unconstitutional because the Zeisel studies show that the jury probably did not understand where the burden of proof lay in assessing his sentence. The state has countered that *Free* cannot complain, since the state may constitutionally place the burden of avoiding the death penalty on him and if the jury was confused on this point it could only have been to *Free's* advantage.

■ We do not agree that such a supposed lack of prejudice settles this matter. *Furman* and *Gregg* have not been overruled, and they stand for the proposition that it is cruel and unusual to apply the death penalty to a defendant, even though he has been fairly convicted of a crime that may constitutionally be punished by death, if the state grants the jury such discretion in sentencing that capital punishment is imposed arbitrarily. If a state has the kind of discretionary and arbitrary system condemned by *Furman* and *Gregg*, it

---

**11.** It may appear that the misunderstanding that the finding of a mitigating factor mandates life instead of death could only be helpful to Free. This is not necessarily so. If the jury understood a mitigating factor to mean something salient enough that it would in itself preclude the death

penalty, they might have been prevented from weighing several mitigating factors which taken together might preclude the death penalty even though no juror thought any one of them alone was sufficient.

cannot lawfully execute a prisoner. As long as *Furman* and *Gregg* remain good law, Illinois cannot leave the jury free to guess in each case who has the burden of persuasion. The Zeisel survey evidence, as we shall see, indicates that that is what a jury receiving the *Free* instructions or the IPI instructions is forced to do.

When an Illinois jury is determining whether a convicted defendant should be put to death it is not finding facts. It has already determined that the state has proved beyond a reasonable doubt that the defendant committed a murder and that one or more aggravating circumstances exist. Under the law, the defendant may be put to death. It falls to the jury to make the judgment, on behalf of society, whether he should be executed or spared, and the rules of evidence are relaxed so that the defendant can offer whatever may be relevant to this determination.

This is not a determination of fact, but a judgment by each juror. Although some weighing of evidence in the usual sense may be necessary in determining whether certain mitigating or aggravating evidence is ,true, most of the time aggravating and mitigating factors are incommensurable. Perhaps the defendant killed a police officer but has no significant criminal history and is mentally retarded. How does one "weigh" such things?

The significance of the burden of persuasion is that it determines what the outcome should be if there is either an absence of evidence or the sentencer cannot decide within some specified range of certainty. In this context, there cannot be an absence of evidence, since the penalty hearing is not a blank slate; the jury will have learned something about the defendant from the facts of the crime. Because the jury can consider evidence received during the guilt phase of the trial, neither side need put in additional evidence at the penalty phase, and the absence of additional evidence mandates neither death nor imprisonment.

However, the burden of persuasion is important because the jurors may be in doubt about the ultimate question and will want to know what the law asks of them. Is the defendant at that stage presumptively worthy of death unless the circumstances call for mercy? Or is the defendant to live unless the jury believes death is the appropriate punishment? Is the question "Is this person so blameworthy that he must die?" or is it "Is there any good reason why this murderer should live?"

Instructing jurors in some cases that they should vote for imprisonment if one of them finds there are mitigating factors that preclude the imposition of the death penalty, and in other cases that they should vote for death if they unanimously find that there are no mitigating factors that preclude the death penalty, would invite a disparity in outcomes. Although logically equivalent, the first statement requires an affirmative act (a "finding") by one juror to prevent death; the other requires an affirmative finding by all in order to impose it.

Free's jurors received both, which may explain some of the confusion discussed below. Free's jury was instructed as follows:

> If, from your consideration of the evidence and after due deliberation, there is at least one of you who finds that there is at least one mitigating factor sufficient to preclude the imposition of the death sentence then you should return a verdict that the Defendant be sentenced to imprisonment.

> On the other hand, if from your consideration of the evidence and after your due deliberation you unanimously find that there are no mitigating factors sufficient to preclude the imposition of the death sentence then you should return a verdict that the Defendant be sentenced to death.

Sentencing Tr. at C8443–44.

It is possible to ask a juror to make a decision on the basis of the evidence without specifying who bears the burden of persuasion, but then the juror will be guided by the juror's own values. One who believes that execution is generally the appropriate punishment for murder will put a heavy burden on the defendant to show why it should not be imposed on him; one who believes that execution is appropriate only for the most depraved criminals will put a similar burden on the state to show why it should be.

We do not believe that such an approach satisfies *Furman* and *Godfrey*. Jurors must be able to put aside their personal beliefs about the death penalty and follow the instructions given them. See *Morgan v. Illinois*, —— U.S. ——, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (defendant has right to voir dire enabling him to remove for cause jurors who would always vote to impose death penalty, just as state may remove jurors who would be unable to impose it). Attitudes toward the death penalty vary widely across geographic regions, economic classes, and educational and cultural backgrounds. If the decision is to be one of law and not of personal preference, the state must decide what the jurors' approach to the question of life and death is to be. To leave the burden of persuasion to the decision of the individual jurors invites the arbitrary imposition of the death penalty. It also requires jurors to make a life or death decision without reasonable guidance on how they are to resolve possible doubts.

■ We believe that the constitution requires the state to specify who has the burden of persuasion and to tell that to the jury. The jury should not be required or permitted to guess. Having been instructed that they must find the facts establishing guilt and at least one aggravating circumstance beyond a reasonable doubt, the jury will expect that there is some burden of proof applicable to the penalty phase, unless they are told there is none. This is not a question on which there is any apparent common sense answer.

■ The burden of persuasion issue is not only a question of who has the burden; it also involves what that burden is. The language of the statute, that the jury is to find whether there are mitigating circumstances sufficient to preclude the death penalty, suggests that a juror must have more than a belief that the death penalty is inappropriate

in that case. "Preclude" means "to rule out" or "to foreclose," and means something stronger than a belief that some action would be wrong[12]; if I think that physically punishing my child would be wrong, I am not precluded from doing so. I might be precluded from such action, however, if it were forbidden by law or my religion. A juror thus might understand that phrase as meaning that the defendant should be put to death unless that would clearly violate some generally accepted social norm or the juror's own moral sense.

A juror might also understand that "preclude" suggests something other than deliberate weighing of factors. Something that precludes is generally a single, decisive factor, not a group of things weighed together. Professor Diamond alluded to this possibility:

> My opinion is that the jurors do not equate those two. That in the "sufficient to preclude", they seem—or some portion of them seem to be looking for the kind of big bullet that every one will agree on is a mitigating factor that's going to stop the bulldozer of aggravation in its tracks. And that seems to me to be a very different quality to a weighing kind of process.

Tr. 266–67. As Professor Levi observed, the word "weigh" does not appear in either the *Free* or the IPI Instructions. T. 523.

A final possibility is that a juror could completely fail to understand the word "preclude." Professor Diamond testified that according to *The Teacher's Word Book of 30,000 Words* by Thorndike and Lorge, the word "preclude" appears between two and three times per million words, while the close synonym "prevent," appears between fifty and one hundred times per million. Tr. 270. Professor Levi testified that of 51 students in a class at Northwestern University that included a substantial number of seniors and

---

12. "Preclude" means

   *   *   *

1. To close or shut up (a passage, etc.) against any attempt to pass; = FORECLOSE 2.

   *   *   *

b. To close beforehand = FORECLOSE 5.

   *   *   *

2. To 'close the door against', shut, prevent the entrance of; to exclude, prevent, frustrate; to render impracticable by anticipatory action.

3. To shut out or prevent (a person) from something by previous action; = FORECLOSE 3.

XII Oxford English Dictionary 322 (2d ed. 1989).

juniors, only five could use the word correctly in a sentence, and only three could select its correct meaning from a field of six choices—fewer than would be expected had they guessed at random! Tr. 527–29. The students were tested using a sentence in which the meaning of "preclude" could not be inferred from context. In the jury instructions, it is reasonably clear that if a juror understood the word "mitigating," which both counsel and judge defined as something calling for a less severe punishment, he would understand from context that "preclude" meant to negate in some way. Whether the further nuances of meaning mentioned above would be conveyed would depend upon whether the word is part of his regular vocabulary—as it probably is not.

Having briefly surveyed what a jury might think the burden of proof is supposed to be, we turn to what the Zeisel studies tell us about what a jury receiving the IPI instructions and Free's jury probably understood. Question 15 was designed to test how the jury, hearing the instructions given at Free's trial, would have viewed the burden of persuasion.

15. The jury in stage one found the defendant eligible for death. Which, if any, of the following four statements are correct and which if any are incorrect under the instructions given by the judge in this case:

(A) Once the jury finds the defendant is eligible for death, the prosecution must prove that mitigating factors do not exist; unless it does, the jury must vote against the death penalty.

1922 Survey—Correct (33%) Incorrect (59%) Don't know (7%)

1990 Survey—Correct (29%) Incorrect (62%) Don't know (8)

(B) Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that mitigating factors exist; unless he does, the jury must vote for the death penalty.

1992 Survey—Correct (49%) Incorrect (40%) Don't know (6%)

1990 Survey—Correct (46%) Incorrect (45%) Don't know (8%)

(C) Once the jury finds the defendant is eligible for death, the prosecution must prove that the death penalty should be imposed; unless it does, the jury must vote against the death penalty.

1992 Survey—Correct (37%) Incorrect (55%) Don't know (6%)

1990 Survey—Correct (37%) Incorrect (56%) Don't know (5%)

(D) Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that the death penalty should not be imposed; unless he does, the jury must vote for the death penalty.

1992 Survey—Correct (38%) Incorrect (55%) Don't know (6%)

1990 Survey—Correct (42%) Incorrect (51%) Don't know (7%)

These questions do not have clearly correct or incorrect answers.[13] The results are significant because they show sharp disagreement about where the burden of persuasion lies. PX 3, Table I. The lack of any

---

13. We therefore disregard the designations of incorrect answers in PX 3 and PX 24.

It can be inferred from *People v. Williams*, 97 Ill.2d 252, 73 Ill.Dec. 360, 384, 454 N.E.2d 220, 244 (1983), that neither side has a burden of persuasion. In *People v. Bean*, 147 Ill.Dec. at 924–25, 560 N.E.2d at 291–92, the Illinois Supreme Court first stated that the burden was upon the defendant to persuade the jury he should not be sentenced to death because of mitigating circumstances but then stated that the state *also* has a burden of persuasion on the same issue. The court finally stated that because it is a matter of balancing intangibles rather than proving facts, it is improper to speak of the defendants having a burden.

The evident though unacknowledged difficulty the Illinois Supreme Court has had with this

question, echoed by the Seventh Circuit in *Silagy*, 905 F.2d at 998–99, supports our finding of confusion here. If seven trained jurists selected for their legal acumen have difficulty in finding where the burden of proof is supposed to go, we should not be surprised that laypersons chosen at random are perplexed.

The Illinois Supreme Court subsequently clarified *Bean*, declaring that the state and the defendant have the burden of *coming forward* with aggravating and mitigating evidence respectively, after which the jury makes a decision with neither side having a burden of proof. *People v. Simms*, 143 Ill.2d 154, 157 Ill.Dec. 483, 495, 572 N.E.2d 947, 959 (1991); *People v. Thomas*, 137 Ill.2d 500, 148 Ill.Dec. 751, 767, 561 N.E.2d 57, 73 (1990).

substantial consensus among the test subjects indicates that the instructions convey no guidance in this respect.

This is supported by the sharply divided response to question 13, which stated:

> After hearing all the evidence in this case, a juror is not persuaded one way or another as to whether there are or are not mitigating factors sufficient to preclude the death penalty. Because the juror has not found that there is a mitigating factor sufficient to preclude death, the juror votes for the death penalty.

In 1992 50% (62% in 1990) of the test subjects responded that the juror had followed instructions, 42% (31% in 1990) responded that the juror had not followed instructions, and 7% (6% in 1990) did not know.

We think this finding of the Zeisel surveys is applicable to jurors receiving the IPI instructions and also to the *Free* jury. The *Free* jury received little more in the way of guidance than the subjects of the Zeisel studies. The prosecuting attorney at the beginning of his closing argument told the jury that the state no longer had a burden of proof, and that the death penalty was an "open question." Sentencing Tr. at C8362–63. This left unclear whether the burden was on the defendant or whether the jurors were to determine for themselves whether death or life was the default outcome. This statement came at the beginning of the prosecutor's summation; about eighty pages of argument, more than an hour (at about a page per minute) (and a recess between closing arguments separated it from the beginning of the jury's deliberations.

The jury was also given virtually no guidance as to what the weight of that burden was, i.e., what the "sufficient to preclude" language meant. Did it mean "sufficient to support a decision against the death penalty," or "sufficient to compel a decision against the death penalty." The Zeisel survey evidence suggests that the respondents saw a difference between mitigating factors weighing in favor of life and mitigating factors precluding the death penalty. Question 12 reads· as follows:

> A juror considers all the evidence and comes to the conclusion that the mitigating evidence outweighs the aggravating evidence and that death is not appropriate. However, she cannot find a mitigating factor that is sufficient to *preclude* the death penalty. The juror votes for the death penalty. (emphasis in original)

If the "sufficient to preclude" language means that the jurors should weigh aggravating and mitigating evidence, the juror of question 12 did not follow instructions. If "sufficient to preclude" means something else, she did. Of the Zeisel 1992 test subjects, 36% (58% in 1990) concluded she followed instructions, 58% (36% in 1990) concluded she did not, and 6% (5% in 1990) said they did not know.

Question 14 is similar.

> A juror believes that what Mr. Woods did is terrible, but in her personal judgment it is not so terrible that he should be given the death penalty. However, on the other hand, she believes the mitigating evidence is no excuse whatsoever for what Mr. Woods did and that there are no mitigating factors sufficient to preclude the death penalty in this case. She votes for the death penalty.

Of the subjects in the 1992 Zeisel study, 56% found that the juror had obeyed the instructions, 39% found she had not, and 5% answered that they did not know. The results of the 1990 survey were similar, with 75% finding that the hypothetical juror had followed instructions, 22% finding that she had not, and 3% answering that they did not know. The weight of this evidence is lessened because question 12 itself suggests that there is a difference between "outweigh" and "preclude". T. 147–48. Nevertheless, the answers to that question disclose substantial disagreement about the meaning of the instructions and add some support for our finding that the "sufficient to preclude" language does not give adequate guidance to the jury.

It was established that "preclude" is an unusual word, and not widely used or understood. Although the jury would probably understand it as a negation, "preclude" contains two definite connotations that may or may not have been understood. First, it has the sense of an absolute barrier to the death penalty, something comparable to a physical

obstacle, in contrast to something arising out of a process of weighing in which a small difference on either side can change the outcome. Second, and related to the foregoing, "preclude" suggests a *single* causative factor, that, as Professor Diamond put it, metaphorically "stops the bulldozer of aggravation in its tracks." The Illinois Supreme Court in *Brownell* held that the statute requires a weighing process, and we are bound by its interpretation. Nevertheless the evidence indicates that "preclude" does not reliably convey that meaning.

Putting aside the meaning of "preclude," Professor Levi testified that "sufficient to preclude" does not guide jurors adequately because it does not explain what would be sufficient. As she explained,

> If you use the word "sufficient", which is roughly equivalent to enough. . . . The question is enough for what, enough for whom, enough according to what criteria? For example, if I ask you, do you have enough money with you, that's pretty vague. Now, in a particular context, say, we are going out for a cup of coffee, and in that context I say, do you have enough money with you, then you may infer that what I mean is enough money to buy your own cup of coffee, and maybe I'm inferring [sic; implying] to buy my cup of coffee also. It depends. But if we are going to, you know, purchase some large set of furniture, and I say do you have enough money with you, then I don't mean two dollars. . . . "Enough" is a word which is inherently very difficult to apply to a particular context without more information. . . .

> Secondly, they are not told that the task involves weighing anything. The verb "weigh" doesn't appear in either instructions, neither Zeisel nor the Free case. . . . So if I were a juror . . . reading this sentence—let's take this clause: "If you unanimously find that there are no mitigating factors sufficient to preclude imposition of the death sentence," that word "sufficient" alone doesn't give me what I need. Because I need more information. How am I supposed to decide what is sufficient. Are there rules from the law? Am I just supposed to decide this off the top of my head? It needs to be grounded more, and

there is not enough language in the instructions to ground it sufficiently.

Tr. 521–23.

We believe that a juror is not given clear guidance as to what is wanted. Is it his own, personal, subjective determination that the defendant should be spared? Or is he being asked for a quasi-objective determination based on his perception of the standards of society, that the death penalty is unacceptable under these circumstances? Nor is it clear whether he is to balance the evidence and vote whichever way he finds himself inclined, or whether a decision to spare the defendant must be based upon what he believes to be such definite evidence that no other outcome is reasonably acceptable—that the death penalty is "precluded."

In addition to the Zeisel survey evidence, all of the expert testimony supports our conclusion that the instructions are unclear as to what the burden of proof is supposed to be. Professor Diamond, in particular, said that she herself had trouble understanding them. Tr. 265. When the instructions contain no guidance, we cannot expect consistency to emerge from the deliberative process, as the blind are led by their more insistent but equally blind colleagues. We conclude that the *Free* jury, like juries receiving the IPI instructions, was probably confused about which side, if any, had a burden of persuasion and what the nature of that burden was.

### Silagy and Williams

Judge Aspen stated that if the first Zeisel survey is valid it calls into question the assumptions underlying the pertinent rulings in *Silagy* and *Williams*. Judge Aspen pointed out that since the validity of a conviction under the Illinois statute depends on whether the jury understands the law it is applying, a determination of validity should if possible be based on substantial evidence rather than judicial speculation. *Free*, 778 F.Supp. at 434–35.

The Seventh Circuit's opinion in *Silagy* focused on the petitioner's claim that the Illinois statute impermissibly created a presumption in favor of the death penalty. This contention was rejected, following the Supreme Court's then recent opinion in *Walton*

*v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), which held that a state could permissibly place on the defendant the burden of proving mitigating circumstances, so long as the state is required to prove every element of the offense and any aggravating factors rendering the defendant eligible for the death penalty. The Seventh Circuit ruled that Section 9–1(g) of the statute also provides constitutional guidance to the sentencer.

> This statutory provision does not place an unconstitutional burden of persuasion on the part of defendant in a sentencing hearing to prove the inappropriateness of the death sentence in his or her case. Rather, this language in a constitutional way, guides the jury (or judge) in determining under what circumstances the death penalty should be imposed. As the Court stated in [*Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)], a State's imposition of the death penalty does not comport with the guarantees of the eight amendment unless the sentencing authority considers "the character and record of the individual offender and the circumstances of the particular offense....", The Illinois statute's mandate that the jury (or judge) consider any mitigating and aggravating circumstances regarding the individual defendant and the particular crime serves to ensure that these eighth amendment rights are observed. Section 9–1(g) simply provides a balance upon which the sentencing authority can place the various mitigating and aggravating circumstances to determine whether the imposition of the death penalty is appropriate in a particular case.

*Silagy,* 905 F.2d at 998. The court followed *People v. Bean* in finding that the statute places an initial burden upon the state to show that there are no mitigating factors sufficient to preclude the death penalty, the burden then falls on the defendant if he attempts to rebut that showing and the jury is to weigh aggravating and mitigating factors. The court agreed that this was constitutional. *Id.* The court also quoted *Bean's*

statement that it is improper to speak of defendants as having a burden, since the jury was balancing intangibles, but did not expressly endorse this statement. Nevertheless, the court appeared to agree that the burden of proof is not meaningful or important at the mitigation phase.

The Seventh Circuit recognized that "a statutory scheme which calls for a particular body ... to weigh various factors must guide that body as to the results which follow from a determination that one set of factors outweighs the other. If no such guidance were given, the weighing process itself would be rendered ineffective as a means of arriving at similar results in similar situations." *Id.* at 999. The court believed the Illinois statute met this standard: "By providing for a certain result based on the balance struck by the jury between the aggravating and mitigating circumstances, § 9–1(g) does not impose a burden of persuasion on the defendant.[14] Rather, it serves to ensure that similar results will be achieved in similar circumstances while, at the same time, allowing the jury to consider the individual characteristics of the defendant and the particularized nature of the crime." *Id.*

The court then addressed the argument that

> the impact of § 9–1(g) is to preclude the sentencer from determining, based on the individual characteristics of the defendant and the unique circumstances of the crime, whether death is the appropriate penalty in his case. Specifically, Petitioner argues that § 9–1(g) denies the sentencer the choice not to impose the death penalty in certain circumstances.

*Id.* The court dismissed this argument, relying on *Blystone* and *Boyde* which had approved statutes mandating the death penalty when aggravating circumstances outweigh mitigating circumstances. *Id.* at 999–1000.

*Silagy's* pertinent holdings thus rested on two conclusions derived from its reading of the statute and the Illinois Supreme Court's interpretation in *Bean.* First, the statute places a burden on the defendant to show

---

**14.** This is puzzling in view of the court's agreement with *Bean* that the statute *does* place a burden upon the defendant. Perhaps the court

meant to say that the statute does not impose an *unconstitutional* burden, which would fit the context.

that the death sentence should not be imposed, but such a burden is constitutionally permissible. Second, the Illinois statute adequately guides the jury in making its decision because, like the statutes upheld in *Blystone* and *Boyde*, it directs the jury to weigh aggravating and mitigating factors.

*Silagy* also addressed a challenge based on *Lockett* to an instruction which described mitigating factors as including "any other facts or circumstances that provide reasons for imposing less than the most severe sentence." Silagy argued that the effect of that instruction together with the prosecution's closing statements on this subject, unconstitutionally foreclosed the jury from considering a mental state short of the statutory "extreme mental or emotional disturbance." This argument was rejected because *Blystone* had upheld a similar instruction. *Silagy*, 905 F.2d at 1006.

These conclusions are challenged by the Zeisel surveys. They are compelling evidence that jurors are uncertain who has the burden of proof at the mitigation phase and what the nature of that burden is. Those studies also show that there is a reasonable likelihood that a substantial number of the *Free* jurors and jurors who received the IPI instructions believed that only the statutory mitigating factors, or factors comparable to them, could preclude the imposition of the death penalty.

Although *Williams* rejected challenges to the Illinois statute more closely resembling those Free raises here, it did so primarily in reliance on *Silagy*. Williams argued that the Illinois death penalty statute improperly requires mitigating evidence to preclude the death penalty because that prevents the jury from making an individualized determination of whether the death penalty is appropriate. Arguing that "preclude" does not direct the

jury to weigh the evidence, he contended that the statute does not permit the jury to sentence the defendant to a punishment less than death if mitigating evidence narrowly outweighs aggravating evidence. 945 F.2d at 935. The Seventh Circuit held this argument foreclosed by *Silagy*, which had found the procedure prescribed by the Illinois statute to be equivalent to Pennsylvania's weighing procedure approved by the Supreme Court in *Blystone*. *Id.* at 936.

Like Free, Williams contended that the "sufficient to preclude" language was vague. In response, the Seventh Circuit quoted Judge Aspen's statement that "the isolated phrase 'sufficient to preclude the imposition of the death sentence' is not vague. It directs the jurors to consider all of the factors presented and to give each factor whatever weight they deem appropriate." *Id.* at 937, quoting *Williams*, 742 F.Supp. at 501. The Seventh Circuit also believed that this argument had been rejected "at least implicitly" by the statement in *Silagy* quoted above, that the statute constitutionally guides the jury in imposing the death penalty. *Williams*, 945 F.2d at 937. The court likewise rejected, as precluded by *Silagy*, the argument that the statute was vague in allocating the burden of persuasion at the sentencing hearing. *Id.*

Williams also challenged the jury instructions, "contending that [they] prevented the jury from making an intelligent decision." *Id.* at 937. It is not clear from the opinion exactly what his argument was; we surmise that it was that the instructions, which followed the language of the statute, were unintelligible.[15]

The court applied the standard set forth in *Boyde* for evaluating a vagueness challenge, *i.e.*, whether there was a reasonable likeli-

---

**15.** In *Williams,* the jury was instructed:

If, after your deliberations, you unanimously determine that there are no sufficiently mitigating factor or factors to preclude the imposition of the death sentence on the defendant, you should sign the verdict form which so indicates.

If, after your deliberations, you cannot unanimously conclude that there are no sufficiently mitigating factor or factors to preclude the imposition of the death sentence, you should sign the form which so indicates.

The jury later was instructed that:

If after your deliberations one or more jurors conclude that the defendant should not be sentenced to death, all jurors shall sign the verdict reflecting the jury's inability to reach a unanimous verdict.

If after your deliberations you unanimously conclude that the defendant should be sentenced to death, all jurors shall sign the verdict reflecting the jury's unanimous conclusion that the court shall sentence the defendant to death. *Williams*, 945 F.2d at 937–38.

hood that the jury had applied the challenged instruction in a way that prevented the consideration of constitutionally relevant evidence. The court stated that after reading the instructions as a whole it was convinced that the jury had been adequately guided. "In our view, the instructions, read as a whole, directed the jury to balance aggravating and mitigating factors and to impose the death sentence only if all members of the jury concluded that aggravating factors outweighed mitigating factors. Therefore, the Illinois statute is not unconstitutionally vague." *Id.*, at 938.

Because *Williams* relied primarily on *Silagy*, the challenge to *Silagy* posed by the Zeisel survey evidence applies to *Williams* as well. The court in *Williams* believed its decision was dictated by *Silagy* with respect to the substantive burden of proof and the alleged vagueness of that burden and the "sufficient to preclude" language. See *Williams;* 945 F.2d at 936, 937. In its discussion of whether the jury instructions "prevented the jury from making an intelligent decision," *id.*, at 937–38, the court did not expressly rely on *Silagy*. But while it based its finding of constitutionality upon its reading of the instructions as a whole, the court did not explain what other instructions, if any, clarified the instructions in question.

*Conclusion*

Jury instructions for capital sentencing are required not only to correctly state the law, but to state it clearly enough for jurors to obey it. Even a single juror's misunderstanding can be critical. *Kubat v. Thieret,* 679 F.Supp. 788, 815 (N.D.Ill.1988) (Bua, J.), aff'd., 867 F.2d 351, 371 (7th Cir.1989). Respondents have not challenged Table II of PX 3 indicating a probability of less than 1 in 100,000 (based on the 1990 Zeisel survey) that at least 85% of jurors will select the correct answer to *any* one of the survey questions with clearly correct answers. We need not decide what specific level of confusion is critical for showing constitutionally significant misunderstanding since the pertinent numbers here are very high and clearly show significant levels of juror confusion.

Because the instructions, not the statute itself, immediately guide the decisionmaking process, it is essential that they be clear and intelligible. A questionable statute can be

saved by a limiting construction. Nevertheless, while decisions of the Illinois Supreme Court may have rendered the statute sufficiently specific as a matter of law—a question that is not before us—neither the jury in Free's case nor juries hearing the IPI Instructions received those interpretations. In determining whether capital sentencing under the Illinois statute is likely to be arbitrary or capricious, we cannot view the statute apart from the instructions through which jurors encounter it. Indeed, respondents have not disputed the thrust of Free's claim, that if the *Free* jurors misunderstood the instructions in the ways disclosed in the Zeisel surveys, then those jurors did not receive the guidance required by the Eighth Amendment in capital sentencing proceedings.

There is no evidence in the record on the extent to which juror comprehension could be improved by better drafted Illinois capital sentencing instructions. We believe that the statute, as interpreted, can be incorporated into jury instructions that clearly tell the jury who has the burden of persuasion, what they can consider, whether their judgment is to be made according to their individual consciences or according to generally accepted values and that in order to decide whether the death penalty is precluded they must weigh the aggravating evidence and mitigating evidence. See James Luginbuhl, *Comprehension of Judge's Instructions In the Penalty Phase of a Capital Trial,* Vol. 16 No. 2 Law & Human Behavior 203 (1992), finding dramatic improvements in comprehension with the use of revised North Carolina Pattern Instructions.

In any case, the issue here is whether the instructions given to the *Free* jury provided adequate guidance under the Constitution. We conclude that such guidance was not given to the *Free* jury, nor do the IPI instructions provide such guidance to other juries in Illinois. The Zeisel studies establish that neither set of instructions is intelligible and definite enough to provide even a majority of jurors hearing them with a clear understanding of how they are to go about deciding whether the defendant lives or dies. We conclude that the Illinois statute, as im-

plemented through these jury instructions, permits the arbitrary and unguided imposition of the death sentence and that Free's sentence was imposed in violation of the Eighth and Fourteenth Amendments. It is therefore recommended that the petition be granted with respect to Free's death sentence on Grounds 5, 10 and 14 and the death sentence vacated with the state to have 120 days from the issuance of the court's order to resentence Free.

Under 28 U.S.C. § 636(b)(1) the parties have 10 days from the date of service hereof to file written objections to this Report and Recommendation with Judge Aspen. Failure to file such objections will normally waive the right to appeal the rulings set forth in this Report. *Egert v. Connecticut General Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir.1990).

### APPENDIX A

1. The juror, going over all the mitigating circumstances finds that all of them were minor and that none of them are a major mitigating circumstance. However, the juror votes against the death penalty.

2. A juror is persuaded that the fact that Mr. Woods was good as a boy is a mitigating factor sufficient to preclude the death penalty. However, she notes that being a good child is not one of the mitigating factors which the judge specifically mentioned. She also believes that being a good child is not an excuse for the murder which is comparable to the other mitigating factors which the Judge specifically mentioned. For this reason, she concludes that she has no choice and must vote for the death penalty.

3. A juror decides that Mr. Woods was under the influence of an extreme emotional disturbance at the time he committed the murder. She decides that this fact is not a sufficient mitigating factor to preclude the death penalty and votes for the death penalty.

4. A juror decides that the fact that Mr. Wood was only 25 years of age when he committed the murder is a mitigating factor sufficient to preclude the death penalty. However the other eleven jurors disagree and insist that his age is not a mitigating factor. The one juror believes that she cannot consider a mitigating factor unless the entire jury agrees upon it and votes for the death penalty. She votes for the death penalty.

5. A juror decides that the fact that Mr. Woods was good to his family is a mitigating factor sufficient to preclude the death penalty. However, the other eleven jurors disagree. The other jurors insist that no juror should consider the defendant's good relations with his family as a mitigating factor unless they all agree it is a mitigating factor. The one juror accepts this approach and votes for the death penalty.

6. A juror decides that Mr. Woods was not under the influence of an extreme emotional disturbance when he committed the murder, but that he did suffer from a mild emotional disturbance at the time of the murder. She concludes that the judge's instructions required that an emotional disturbance be an "extreme" disturbance in order to be a sufficient mitigating factor, and thus a mild emotional disturbance cannot be a mitigating factor sufficient to preclude death [The 1990 survey erroneously said "impose" instead of "preclude"]. She votes for the death penalty.

7. A juror decides that the fact that Mr. Woods did not kill more than one person is a reason sufficient not to sentence him to death. However, she also concludes that this fact is not one of the mitigating factors which the judge specifically mentioned. She also does not believe this fact provides a reason to spare the defendant's life that is comparable to any with the mitigating factors which the judge specifically mentioned. She concludes that as a result she must vote for the death penalty and does so.

8. A juror decides that the fact that Mr. Woods did not actually rape either of the women is a mitigating factor sufficient to preclude the death penalty. She votes against the death penalty.

9. A juror decides that Mr. Woods had a significant criminal record. However, the juror also concludes that the fact that none of Mr. Woods prior crimes was violent is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

10. A juror decides that Mr. Woods will never be rehabilitated to useful citizenship. But she also decides that Mr. Woods may be rehabilitated enough to be a safe and obedient prisoner. She concludes that this is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

11. A juror decides that the fact that Mr. Woods very much regretted what he did is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

12. A juror considers all the evidence and comes to the conclusion that the mitigating evidence outweighs the aggravating evidence and that death is not appropriate. However, she cannot find a mitigating factor that is sufficient to *preclude* the death penalty. The juror votes for the death penalty.

13. After hearing all the evidence in this case, a juror is not persuaded one way or another as to whether there are or are not mitigating factors sufficient to preclude the death penalty. Because the juror has not found that there is a mitigating factor sufficient to preclude death, the juror votes for the death penalty.

14. A juror believes that what Mr. Woods did is terrible, but in her personal judgment it is not so terrible that he should be given the death penalty. However, on the other hand, she believes the mitigating evidence is no excuse whatsoever for what Mr. Woods did and that there are no mitigating factors sufficient to preclude the death penalty in this case. She votes for the death penalty.

15. The jury in stage one found the defendant eligible for death. Which, if any, of the following four statements are correct and which if any are incorrect under the instructions given by the judge in this case: (A) Once the jury finds the defendant is eligible for death, the prosecution must prove that mitigating factors do not exist; unless it does, the jury must vote against the death penalty. (B) Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that mitigating factors exist; unless he does, the jury must vote for the death penalty. (C) Once the jury finds the defendant is eligible for death, the prose-cution must prove that the death penalty should be imposed; unless it does, the jury must vote against the death penalty. (D) Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that the death penalty should not be imposed; unless he does, the jury must vote for the death penalty.

16. After deliberating for two days, nine jurors are convinced that death should be imposed. Three jurors believe death should not be imposed. The jurors are all convinced that they will not change their mind. Read the following three statements and check the one which best describes, under the judge's instruction, what the jury should do: (a) All sign the verdict from "we, the jury, unanimously find that there are no mitigating factors sufficient to preclude the imposition of a death sentence." (b) All sign the verdict form, "we, the jury, do not unanimously find that there are no mitigating factors sufficient to preclude a death sentence." (c) Tell the judge, they cannot reach an unanimous verdict.

17. Finally, based on the little you know about this case, how do you feel about it? Would you lean toward the death penalty or would you lean toward voting against it?

18. Have you served as a juror in a death penalty case in Illinois in the last ten years?